JOSEPH R. DONNELLY, JR., *et al.*, Plaintiffs-Appellees and Cross-Appellants, v. WASHINGTON NATIONAL INSURANCE COMPANY, Defendant-Appellant and Cross-Appellee.

First District (3rd Division) No. 83—2925

Opinion filed August 14, 1985.

Winston & Strawn, of Chicago, and Daniel A. Orth III, of Evanston, for appellant.

Cornelius P. Callahan, of Chicago, for appellees.

PRESIDING JUSTICE WHITE delivered the opinion of the court:

Plaintiffs, the children of Joseph R. Donnelly, Sr., brought suit against defendant Washington National Insurance Company (Washington National) alleging in count I of their amended complaint that Washington National refused to pay a valid claim for life insurance, and alleging in count II that the insurance company's actions were

fraudulent. The jury returned verdicts against defendant for $100,000 on count I and $1,000,000 on count II. The court denied defendant's post-trial motions for judgment notwithstanding the verdict and for a new trial; the court also denied plaintiffs' post-trial motion for interest, attorney fees and costs. Defendant appeals from the judgments entered on both counts, and plaintiffs cross-appeal from the court's denial of their motion for interest, attorney fees and costs. We affirm the judgment on count I, reverse on count II, and affirm the order denying interest, attorney fees and costs.

Joseph R. Donnelly, Sr. (Donnelly), worked in the sales department of Consolidated Packaging Corporation (Consolidated) from 1973 until July 16, 1976. Consolidated had group life and group health insurance policies with Washington National. Under the terms of those policies, if Donnelly was totally disabled when he left Consolidated, his coverage under both policies continued until the disability ended. He also had the right to convert his coverage under the group policies to individual coverage within 31 days of the termination of his employment with Consolidated.

Donnelly began working for St. Regis Paper shortly after he left Consolidated. St. Regis had group life and group health policies with another insurer, but under the terms of those policies a new employee was not covered until he had been working for St. Regis for 60 days.

On August 9, 1976, within the 31-day conversion period, Donnelly went to Washington National's office and he spoke to Linda Hoffmann, a conversion clerk for Washington National. He filled out an application to convert his health insurance to individual coverage, and he paid a premium of $90.86, which covered the period from July 16, 1976, to October 1, 1976. He brought to that office a card from Consolidated which showed that the limit for his life insurance coverage was $36,000. Washington National conceded at trial that the limit for his life insurance coverage should have been at least $73,000. Donnelly did not convert his life insurance, and there is a dispute between the parties as to what did transpire between Donnelly and the office employees of Washington National. However, Washington National's records indicate that it did not close Donnelly's life insurance file until September 2, 1976, 15 days after the 31-day period for conversion expired. As a standard practice, Washington National allowed a 15-day extension of the conversion period, and sent a follow-up letter, whenever a client asked for further information regarding his conversion rights. Thus, there is uncontradicted evidence that on August 9, 1976, Donnelly had incorrect information regarding the limit for his life insurance coverage, and Donnelly asked Washington National's representa-

tive for further information regarding his right to convert his life insurance.

On August 16, 1976, Donnelly went to see Dr. Floyd Shewmake, complaining of pain in his legs. On the advice of Dr. Shewmake, Donnelly entered a hospital the next day. On August 17, 1976, Dr. Shewmake informed Donnelly that Donnelly had lung cancer. On September 21, 1976, Donnelly died of bronchogenic carcinoma of the right lung with metastases, survived by six children. The children are the plaintiffs in this case. The oldest child was 20 years old at that time; the youngest was nine. Their mother had died two years earlier. Washington National paid Donnelly's hospital bills in accordance with the converted individual health insurance policy Donnelly obtained on August 9, 1976. However, Washington National refused to pay Donnelly's life insurance claim.

Plaintiffs allege in count I of their amended complaint that on Donnelly's visit to Washington National's offices on August 9, 1976, an agent of Washington National promised to send Donnelly a letter containing the information he would need to convert his life insurance policy, and plaintiffs allege that the letter was not sent. In count II plaintiffs allege that the promise to send the letter was made for the purpose of deceiving and with the intent of defrauding Donnelly by inducing him not to convert his group life insurance policy and that Donnelly in reliance on the promise was thereby prevented from converting the policy to an individual policy.

By the evidence deposition of its employee, Linda Hoffmann, Washington National established that, according to its records, Washington National sent Donnelly a follow-up letter. At trial plaintiffs introduced evidence to show that no such letter was sent. Plaintiffs produced testimony of four witnesses who were members of the Donnelly household in August and September 1976; none remembered seeing any letters from Washington National during that time. Plaintiffs also produced evidence that Donnelly continued to attempt to get information regarding conversion. Tom Wallner, who worked with Donnelly at Consolidated, testified that he visited Donnelly in the hospital on August 17 or 18. During that visit, he telephoned Cynthia Colagrossi, a secretary for Consolidated, and asked her to check on the status of Donnelly's insurance. He testified that she told him that she could not find out anything definite. Colagrossi testified that, pursuant to Wallner's request, she called Diane Norris and Charlotte Ramos, employees of Consolidated who handled insurance matters for salaried employees, and she asked them to determine the status of Donnelly's coverage. She understood that they would contact Washington Na-

tional regarding Donnelly's insurance. She testified that she called them several times, and each time she was told that they were checking into Donnelly's health insurance.

Several other witnesses for plaintiffs testified that they attempted to find further information regarding Donnelly's insurance. Donnelly's sister testified that she spoke to Robert Golbier, an insurance salesman for Washington National, on September 9, 1976, one week after Donnelly's extended conversion period expired. She asked him if Donnelly was covered. She next asked Golbier if Donnelly could become covered, and if there was any grace period. She did not testify concerning Golbier's responses because the trial court ruled that such testimony was inadmissible hearsay. Donnelly's brother-in-law testified that on September 13, he spoke to Donald Poklop and Jacqueline Anthony, who worked in Washington National's claims department, and they told him that Donnelly was not covered. Robert Golbier and Jacqueline Anthony, who were no longer employed by Washington National at the time of trial, were not presented as witnesses.

Washington National responded to plaintiffs' witnesses with evidence that they sent Donnelly their usual follow-up letter regarding insurance conversion. Robert Prochnow, general supervisor of the group premium accounting division at Washington National, testified that people in his department began searching for a copy of the letter to Donnelly shortly after suit was filed in 1979. The search continued until August 1982, when Linda Hoffman discovered a document which she identified as a carbon copy of the letter she sent to Donnelly in August 1976. The name "Bill Razor" is handwritten in red on the document.

Willis Razor, a senior account executive for Washington National who handled the Consolidated account in 1976 and 1977, testified that according to Washington National's practice at the time, if a Consolidated employee disputed the amount of coverage he was entitled to convert, William Razor would be contacted. Razor further testified that he had no idea why his name was on the carbon of the letter. He testified that he did not know the amount of life insurance Donnelly would have been allowed to convert, but Razor admitted, under cross-examination, that in his deposition he stated that Donnelly was entitled to convert to $90,000 or $100,000 in life insurance.

A few months after Donnelly died, Consolidated's employee Diane Norris prepared a summary of Washington National's and Consolidated's activities relating to claims on Donnelly's insurance and plaintiffs introduced this summary into evidence at trial. According to the summary, Donnelly asked Linda Hoffmann on August 9, 1976, about

his conversion privileges for life insurance. She explained the privilege to him, and he asked to have the rate sent to him in writing. According to the Norris summary, Hoffmann sent the required letter within two days of meeting Donnelly. By late August 1976, Norris, Ramos and Colagrossi, all employees of Consolidated, were aware that Donnelly was hospitalized and that he was trying to find out the status of his insurance coverage.

The report further shows that Razor of Washington National met with Norris and other employees of Consolidated two days after Donnelly's death. Razor was "furious because [Consolidated's] internal administration [of the insurance coverage did] not correspond to the contract *** with Washington National." He said that the mistakes almost rendered Washington National liable on Donnelly's claim. They were safe because Donnelly died five days after the expiration of his coverage under Consolidated's contract, and he did not take the conversion option.

Linda Hoffmann testified in her deposition that she could not remember meeting Donnelly, but she testified that the written records indicate that Donnelly asked her to send him a letter stating the rates for conversion, and as a standard practice, she would have promised to send him a letter stating those rates, and she would have informed him that he had 15 days beyond the end of the initial conversion period in which to convert his insurance. According to her records, she sent him the letter on August 11, 1976; however, she had no independent recollection of the letter or any other aspect of her transaction with Donnelly. She testified that in 1982 she found the carbon of the letter sent to Donnelly. She testified that it was not properly filed; it was in a box labelled "1975" instead of "1976."

If a customer challenged the maximum amount of coverage shown on the conversion card from his employer, she testified that she would say something like: "I can't say this is how much you can convert to, until I find out for sure," or "I'll look into this further *** and I'll advise you by letter."

Defendant moved for directed verdicts on both counts of the complaint at the close of all the evidence. The motions were denied. The jury returned general verdicts for plaintiffs on both counts, and it returned two special verdicts on count I, finding that (1) Donnelly was not disabled when his employment with Consolidated terminated, and (2) Washington National failed to send Donnelly a letter telling him the premium amount necessary to convert his group life insurance to individual life insurance.

COUNT I

Defendant contends that the judgment on count I of the complaint must be reversed because: (1) defendant had no duty to send Donnelly a letter informing him of the premiums necessary to convert his life insurance; (2) if there was such a duty, the jury's finding that breach of the duty proximately caused plaintiffs harm is against the manifest weight of the evidence; (3) the jury's finding that the letter was not sent is against the manifest weight of the evidence; (4) plaintiffs' proof did not conform to their pleadings; and (5) the trial court gave the jury erroneous instructions. Defendant also contends that the verdict on count I must be reduced to $73,000, since that is the maximum amount of life insurance plaintiffs could have received.

■ Defendant argues that its contract with Consolidated did not impose any duty on defendant to inform Consolidated employees by mail of their conversion privileges, and defendant's employee, Hoffmann, could not bind defendant by her promise to send the information. However, defendant acknowledges that when one insured under the group plan asks about converting his group insurance to individual coverage, defendant has a duty to inform him of the rate he must pay to convert, because without that information the insured will be unable to convert. Each party to a contract has a duty not to prevent performance of the contract. (*Lukasik v. Riddell, Inc.* (1983), 116 Ill. App. 3d 339, 346, 452 N.E.2d 55.) Donnelly had a contractual right to receive the rate information he needed to convert his policy to the maximum amount of coverage he could have received. Defendant's records show that Donnelly asked for this information.

■ Defendant contends that its agent, Linda Hoffmann, informed Donnelly of the rates he needed to pay for life insurance when he went to its office, and thus defendant fully met its contractual duty. There was, however, no direct evidence of this. Hoffmann testified that she had no recollection of Donnelly's visit; her testimony concerned only her customary practice and the meaning of the records. According to the records, Donnelly asked Hoffmann to send him the conversion rates on paper, and in accordance with standard practices at Washington National, she promised to send them. There is in all contracts an implied covenant of good faith cooperation. (*Dykstra v. Crestwood Bank* (1983), 117 Ill. App. 3d 821, 326, 454 N.E.2d 51.) Once Washington National, through its agent, promised to send Donnelly in writing the rates he would need to pay to take advantage of the conversion option, defendant was required, under its duty of good faith cooperation, to inform Donnelly of his conversion rates in writing. See *Lumbermen's Mutual Insurance Co. v. Slide Rule & Scale*

*Engineering Co.* (7th Cir. 1949), 177 F.2d 305, 308-09.

■ Next, Washington National claims that there was no evidence that its failure to send a letter caused plaintiffs any harm, since Donnelly could have decided not to purchase an individual policy even if he had received the letter, in which case plaintiffs would not have been any better off. (See *Crum v. Krol* (1981), 99 Ill. App. 3d 651, 663, 425 N.E.2d 1081.) There is evidence that Donnelly asked Washington National to inform him of the rates he needed to pay to convert, and there is evidence that Donnelly always maintained insurance far in excess of base amounts. Donnelly discovered that he had lung cancer on August 17, 1976, while he still had the right to convert his life insurance. The jury was entitled to find that, if Washington National had sent the letter Donnelly requested, he would have converted, and this adequately shows that Washington National's failure to meet its contractual duty caused Donnelly not to convert, thereby causing damage to the expected beneficiaries of his life insurance. Foreseeable consequential damages of the breach of an insurance contract are recoverable. *Clark v. Standard Life & Accident Insurance Co.* (1979), 68 Ill. App. 3d 977, 986, 386 N.E.2d 890.

■ Washington National further asserts that the jury's finding that the letter was not sent is contrary to the manifest weight of the evidence. Washington National relies on Hoffmann's testimony regarding Washington National's customary practices, and a misfiled carbon copy of a 1976 letter, discovered in 1982, after three years of searching.

Washington National argues that the evidence is sufficient to overturn the jury's finding, citing *Commonwealth Edison Co. v. Property Tax Appeal Board* (1978), 67 Ill. App. 3d 428, 384 N.E.2d 504. That court held that mailing can be proved by office custom if there is evidence showing that the custom was followed in the particular instance. (67 Ill. App. 3d 428, 430-31.) However, the office custom merely raises a presumption of mailing which can be offset by evidence that the letter was not received. (*Lynn v. Village of West City* (1976), 36 Ill. App. 3d 561, 564, 345 N.E.2d 172.) Defendant also cites a number of cases, from other jurisdictions, which state that discovering copies where they should have been found if the original were mailed is evidence of mailing. (*Good v. Detroit Automobile Inter-Insurance Exchange* (1976), 67 Mich. App. 270, 275-76, 241 N.W.2d 71, 74; *Consolidated Motors, Inc. v. Skousen* (1941), 56 Ariz. 481, 486, 109 P.2d 41, 43, *cert. denied* (1941), 314 U.S. 631, 86 L. Ed. 507, 62 S. Ct. 64.) But in this case, the alleged copy of the letter was found misfiled.

Plaintiffs presented evidence that Donnelly made inquiries concerning his insurance after he entered the hospital, from which the jury could infer that Donnelly had not been adequately informed of his conversion rights by mail or otherwise. Four witnesses who lived at Donnelly's address around the time that the letter should have arrived testified that they had not seen any letter from Washington National, at a time when they had reason to be concerned about insurance. "The credit to be given to [a witness's] recollection may greatly depend upon the reasons moving him to pay particular attention to the occurrence ***." (81 Am. Jur. 2d *Witnesses* sec. 634 (1976).) The jury by special verdict found that the letter was not sent. We cannot say that the jury's verdict was against the manifest weight of the evidence.

■ Washington National next contends that plaintiffs failed to conform their proofs to their pleadings. Since count I is based on the contract for group insurance, plaintiff needed to plead and prove: (1) the existence of a valid contract between defendant and plaintiffs' decedent; (2) plaintiffs' right to enforce the contract; (3) performance, or a valid excuse for nonperformance, by plaintiffs' decedent; (4) breach by defendant and (5) consequent harm to plaintiffs. *Martin-Trigona v. Bloomington Federal Savings & Loan Association* (1981), 101 Ill. App. 3d 943, 946, 428 N.E.2d 1028; *Wells v. George W. Durst Chevrolet Co.* (1930), 341 Ill. 108, 111, 173 N.E. 92.

Plaintiffs properly pled the existence of the contract for group life insurance from Washington National, covering plaintiffs' decedent, under which Donnelly had the right to convert to individual life insurance. Plaintiffs also pled and proved their right to enforce the contract as beneficiaries under the group life policy. *Union Trust Co. v. Chicago National Life Insurance Co.* (1932), 267 Ill. App. 470, 477.

Plaintiffs claim that Donnelly's failure to sign an application and pay the premium required for conversion is excused by defendant's conduct. Plaintiffs presented evidence that defendant prevented Donnelly from converting his life insurance by promising then failing to furnish in writing the information needed to convert to an individual policy. This evidence, if believed, would excuse Donnelly's failure to sign an application and pay the premium. (*Levy v. American Automobile Insurance Co.* (1961), 31 Ill. App. 2d 157, 164, 175 N.E.2d 607.) Thus, the excuse for Donnelly's failure to perform the contractual conditions was properly pled and proved. Plaintiffs did not need to prove, as Washington National contends, that Washington National told Donnelly that he could not convert his insurance.

As to the fourth element of plaintiffs' cause of action, we have al-

ready held that plaintiffs adequately proved that defendants failed to send the promised letter, thereby breaching the implied contractual duty of good faith cooperation, and that proof matches plaintiffs' pleadings.

Finally, plaintiffs also showed that Washington National's breach caused plaintiffs harm in that they established the likelihood that Donnelly would have purchased the life insurance had he received the necessary information.

Although there are some extraneous allegations in count I, there is no indication that any imperfections in the pleadings misled the defendants, to their prejudice, concerning the nature of the proofs to be shown at trial. (*Stevenson v. Meyer* (1957), 10 Ill. 2d 335, 339, 139 N.E.2d 740.) Therefore, we find that plaintiffs' proofs on count I adequately conformed to their pleadings.

■ Washington National next argues that the judgment on count I must be reversed because the trial court instructed the jury that, if either party failed to produce a witness within its power to produce, the jury may infer that the testimony would be adverse to that party. Plaintiffs' counsel argued to the jury that defendant's failure to produce its former employees, Jacqueline Anthony, Robert Golbier, and Dee Weber, indicated that those employees would testify adversely to defendant.

As this court stated in *Tonarelli v. Gibbons* (1984), 121 Ill. App. 3d 1042, 1046-47, 460 N.E.2d 464, discussing the instruction concerning inferences to be drawn from the failure to produce witnesses: "The giving of this instruction is within the sound discretion of the trial court, and a reviewing court will reverse only where a clear abuse of discretion appears of record." The three former employees of Washington National were personally involved in Washington National's actions in connection with the Donnelly claim. We cannot say that the trial court's decision to give the instruction regarding the absence of potential witnesses was a clear abuse of discretion requiring reversal of the trial court judgments.

■ Finally, defendant argues that the $100,000 award on count I must be changed because the maximum amount of life insurance Donnelly could have obtained was $73,000. Plaintiffs relied solely on the testimony of Willis Razor to establish the amount of defendant's liability on the contract. Razor admitted on cross-examination that he stated, in a deposition taken in 1980, that Donnelly was entitled to convert $90,000 to $100,000 of life insurance coverage.

Defendant contends that the amount of the jury verdict is contrary to the manifest weight of the evidence because (1) Razor testi-

fied on direct examination that he did not know the proper maximum amount of life insurance available for Donnelly; (2) defendant's witness Crawford testified that the proper maximum amount of life insurance for Donnelly was $73,000; and (3) defendant placed in evidence Donnelly's W-2 form for 1976, covering his last two months of work for Consolidated Packaging.

According to the policy, income for the 12-month period ending March 1, 1976, determined the maximum amount of life insurance Donnelly could have obtained. Neither party presented admissible evidence establishing Donnelly's income for that period. Defendants presented Donnelly's W-2 form for 1976. That form showed Donnelly's income for only two months of the relevant time period, so it did not establish the limit for Donnelly's policy. The only other evidence defendant relies on to establish the amount of coverage available to Donnelly was the testimony of Muriel Crawford, a staff attorney for Washington National. It is for the jury to determine the credibility of the witnesses and the weight to be given to the testimony of those witnesses. The jury's decision to believe the testimony of Razor instead of the testimony of Crawford is not against the manifest weight of the evidence. Thus, we affirm the verdict on count I for $100,000.

## COUNT II

■ Plaintiffs allege in count II of the fraud count of their complaint, that defendant represented to plaintiffs' decedent that it would send him a letter, and that defendant made this representation, "without knowing it to be true," with the intent of deceiving and defrauding Donnelly. Defendant contends, *inter alia*, that plaintiffs neither pled nor proved one of the essential elements of fraud, that defendant through any of its agents made a material misrepresentation of fact. Plaintiffs argue that Hoffmann's promise to send the letter was, in this context, a material misrepresentation, and it was an integral part of the fraudulent scheme.

As this court recently observed:

"The general rule is that a promise to perform an act, though accompanied at the time with an intention not to perform it, is not such a false representation as will constitute fraud. (*Roda v. Berko* (1948), 401 Ill. 335, 340, 81 N.E.2d 912; see also *Steinberg v. Chicago Medical School* (1977), 69 Ill. 2d 320, 334, 371 N.E.2d 634.) There is a well recognized exception to this rule where the false promise or representation of future conduct is alleged to be part of a scheme employed to accomplish the fraud. (*Steinberg; Roda.*)" *Goldberg v. Goldberg* (1981), 103

Ill. App. 3d 584, 588, 431 N.E.2d 1060.

In *Steinberg*, the plaintiffs pled both that the defendants made the promise with no intention of performing, and that the promise was part of the pre-existing scheme. (*Steinberg v. Chicago Medical School* (1977), 69 Ill. 2d 320, 332-34.) Our supreme court held that those allegations of fraud were sufficient to withstand a motion to dismiss. 69 Ill. 2d 320, 332.

In the instant case, plaintiffs do not contend that defendant, through its agent Hoffmann, made the promise fraudulently, and they do not contend that the alleged scheme to deny Donnelly life insurance existed at the time Hoffmann promised to send Donnelly a letter. Defendant could not have known of Donnelly's illness before Dr. Shewmake's tests revealed the illness on August 17, 1976, eight days after Donnelly spoke to Hoffmann. The evidence does not support an inference that defendant's employees tried to prevent Donnelly from obtaining life insurance before they had reason to know that Donnelly was dying.

We hold that a promise of future action does not constitute a material misrepresentation that can support an allegation of fraud, unless the promise is made, as part of a pre-existing fraudulent scheme, with no intention of performing the promised acts. (*Steinberg v. Chicago Medical School* (1977), 69 Ill. 2d 320.) There was no evidence that defendant's representation that it would send Donnelly a letter is such a promise. Accordingly, we reverse the $1,000,000 verdict for plaintiffs on the fraud count.

### INTEREST, ATTORNEY FEES AND COSTS

In their post-trial motion and on appeal, plaintiffs claim that they are entitled to attorney fees, costs, and $5,000 under section 155 of the Illinois Insurance Code (Ill. Rev. Stat. 1981, ch. 73, par. 767). They also claim interest on the $100,000 verdict under section 2 of the Interest Act (Ill. Rev. Stat. 1981, ch. 17, par. 6402). Section 155 of the Illinois Insurance Code provides, in relevant part:

"In any action *** wherein there is in issue the liability of a company on a policy *** of insurance ***, and it appears to the court that such action or delay is vexatious and unreasonable, the court may allow as part of the taxable costs in the action reasonable attorney fees, other costs, plus an amount not to exceed ***

(b) $5,000." Ill. Rev. Stat. 1981, ch. 73, par. 767.

Plaintiffs contend that the trial court committed reversible error in failing to award attorney fees, because the evidence requires a

finding that defendant's conduct was vexatious and unreasonable. As the court noted in *Fassola v. Montgomery Ward Insurance Co.* (1982), 104 Ill. App. 3d 825, 832, 433 N.E.2d 378:

> "The question of vexatious [conduct] is a factual one, which must be based upon an assessment of the totality of the circumstances, taken in broad focus. (*Deverman v. Country Mutual Insurance Co.* (1977), 56 Ill. App. 3d 122, 124, 371 N.E.2d 1147.) A trial court's determination on the issue will not be disturbed unless an abuse of discretion is demonstrated on the record. (56 Ill. App. 3d 122, 124.)"

Donnelly converted his hospital insurance and defendant paid Donnelly's hospital bills. Plaintiffs alleged and proved only that defendant promised to send a letter and failed to keep the promise. Although the failure to send the letter Donnelly needed to convert his life insurance constituted a breach of the contractual duty of good faith cooperation, it does not constitute vexatious conduct. We find no abuse of discretion in the trial court's determination that defendant's conduct was not vexatious; accordingly we affirm the trial court's order denying plaintiffs attorney fees and costs.

 Finally, plaintiffs contend that the trial court erred in denying plaintiffs' motion for interest under section 2 of the Interest Act (Ill. Rev. Stat. 1981, ch. 17, par. 6402). That section provides:

> "Creditors shall be allowed to receive at the rate of five (5) per centum per annum for all moneys after they become due on any *** instrument of writing ***."

Illinois courts have consistently held that, "[f]or recovery of such interest, the sum due must be liquidated or subject to easy determination by calculation or computation." *Marvel Engineering Co. v. Commercial Union Insurance Co.* (1983), 118 Ill. App. 3d 844, 854, 455 N.E.2d 545.

Plaintiffs cite several Illinois cases in which prejudgment interest was allowed on life insurance policies, accruing from the date on which plaintiffs supplied proof of death to the insurance company. (See, *e.g., Supreme Lodge of Ancient Order of United Workmen v. Zuhlke* (1889), 129 Ill. 298, 21 N.E. 789.) However, plaintiffs cite no case in which there was conflicting evidence as to the amount of the insurance policy. Plaintiffs correctly point out that there is no policy in this case because of defendant's misconduct. However, there is a substantial dispute in this case regarding the maximum amount of life insurance which would have been available to Donnelly, and both parties relied on the testimony of witnesses to establish the correct maximum. Therefore, the amount of insurance which Donnelly could have

converted is not subject to easy determination. Accordingly, we affirm the trial court decision denying plaintiffs' motion for interest.

Affirmed in part, reversed in part.

McNAMARA and McGILLICUDDY, JJ., concur.