JEAN SCHAFFNER *et al.*, as Co-Guardians of the Estate and Person of Daniel Schaffner, Plaintiffs-Appellees, v. CHICAGO AND NORTH WESTERN TRANSPORTATION COMPANY, Defendant-Appellant (Schwinn Bicycle Company, Defendant-Appellee).

First District (3rd Division) No. 86—1200

Opinion filed September 23, 1987.

744

Lawrence X. Pusateri, Michael M. Lane, and Ann P. Goodman, all of Peterson, Ross, Schloerb & Seidel, and James P. Daley and George H. Brant, both of Chicago and North Western Transportation Company, both of Chicago, for appellant.

Corboy & Demetrio, P.C., of Chicago (Philip H. Corboy, Bruce Robert

748

Pfaff, and David A. Novoselsky, of counsel), for appellees Jean Schaffner and Perry Schaffner.

Baker & McKenzie, of Chicago (Francis D. Morrissey, Michael K. Murtaugh, Marie A. Monahan, and John A. Krivicich, of counsel), for appellee Schwinn Bicycle Company.

PRESIDING JUSTICE McNAMARA delivered the opinion of the court:

Plaintiffs Jean and Perry Schaffner, as co-guardians of the estate and person of Daniel Schaffner, brought this action after their 15-year-old son Daniel sustained serious injuries when he fell off his bicycle, manufactured by defendant Schwinn Bicycle Company, as he rode the bicycle across railroad tracks owned and maintained by defendant Chicago and North Western Transportation Company.

A jury returned a verdict of $8,235,000 in favor of plaintiffs and against Chicago and North Western (the railroad). The jury also returned a verdict in favor of Schwinn and against plaintiffs. The trial court entered judgments on the verdicts, and the railroad appeals from both judgments. It contends that the trial court improperly admitted evidence of the post-accident repairs it made to the railroad crossing; that the trial court erred in excluding certain photographs which the railroad offered in evidence, while admitting photographs offered by plaintiffs; that the trial court erred in permitting Schwinn's counsel to comment on certain missing witnesses in closing argument; that numerous other errors individually or cumulatively resulted in prejudice to the railroad; and that the award of damages was excessive.

Plaintiffs appeal from the judgment in favor of Schwinn. They contend that the trial court erred in permitting Schwinn to introduce evidence regarding state of the art bicycles and evidence of bicycle sales; that the trial court erred in permitting Schwinn's in-court demonstration involving a juror; that the trial court erred in giving the jury an instruction which placed the burden of proving feasibility of alternative design upon plaintiffs; and that the jury verdict and special interrogatory in favor of Schwinn were against the manifest weight of the evidence.

On September 4, 1976, Daniel and two friends, James Fiocchi and Brian Coxon, rode their bicycles to a local movie theatre in Highland Park at about 10 p.m. The boys parked and locked their bicycles outside the theatre. At about midnight, they left the theatre on their bicycles. As they rode across a railroad crossing on Central Avenue in

Highland Park, the front wheel of Daniel's bicycle disengaged from the front fork and became jammed within the bicycle frame. Daniel was thrown over the handlebars and onto the pavement beyond the crossing.

Daniel sustained serious head injuries and was hospitalized. He remained in a coma for two months. Consequently, he retained little or no reliable memory of the accident itself. Daniel remained in the hospital until June 30, 1977. During that time, surgery was performed three times in order to remove blood which accumulated in the skull; to remove one-third of the right side of the brain, which was damaged; and to relieve pressure on the skull caused by the swelling of the brain. He sustained numerous permanent injuries, including facial deformities, impaired speech, unstable and abnormal gait, left-sided hemiparesis and spasticity, clawed left hand, deformed left foot and gait, blindness in right eye due to optic nerve atrophy, loss of half of his visual field in the left eye, and inappropriate, uninhibited behavior.

Daniel is unable to live alone, and requires some supervision of his activities. Daniel is capable of providing for his basic physical needs, such as dressing and bathing himself, and performing simple cooking or homemaking activities. He currently lives with his parents. His life expectancy is 30 years longer than that of his parents. Daniel's total medical bills at the time of trial were $235,486.99. His future medical expenses were estimated to be $372,000, including the costs of jaw surgery, weekly speech and physical therapy, and weekly group therapy sessions.

The bicycle Daniel rode was a 1973 Schwinn "Continental" 10-speed bicycle equipped with a quick release mechanism on the front wheel. A quick release hub is a lever-activated device which permits the front wheel to be taken off the fork without tools. Daniel was given the bicycle, which was originally his brother's, in 1976. Prior to the accident he rode the bicycle frequently over a variety of good and bad road conditions without any problems. Daniel testified that he checked the tightness of the front quick release hub and wheel before leaving the movie theatre and that the wheel was fastened securely to the fork. Other witnesses testified that Daniel knew how to use the release mechanism properly.

Irving Hazard testified for plaintiffs as an engineering expert that in his opinion the cause of Daniel's injuries was the combination of the unsafe wheel design and the roughness of the crossing. The condition of the crossing contributed to Daniel's fall by causing the bicycle frame to move up sufficiently to allow the wheel to move out from the fork.

Hazard opined that the design of Daniel's bicycle was defective and unreasonably dangerous because the front wheel was not attached to the fork by means of a positive locking assembly. Without a positive retention system, there are foreseeable ways in which the wheel can disengage from the fork. The positive retention clips would have prevented the incident. The accident also could have been prevented if the bicycle had a C-clip design such as the one invented for Schwinn in 1972 or the C-clip used by Raleigh on its 1985 model bicycle. The foreseeability of the accident was demonstrated by the numerous other similar occurrences on Schwinn bicycles which had no positive retention device. The absence of reported accidents involving Schwinn bicycles equipped with positive retention clips proved to Hazard that the devices would in fact prevent such accidents.

Stanley Jameson, a former Schwinn employee, testified that in 1972 he designed a "C-clip" attachment for the front fork of Schwinn bicycles at the request of his boss, Frank Brilando, in order to prevent wheel disengagement. The design was incorporated into a patent application filed in December 1972. On April 30, 1974, a patent was issued for the design. Jameson testified that he tested the design and was satisfied that it prevented wheel disengagement. Schwinn, however, never used the C-clip design. A 1985 Raleigh bicycle admitted into evidence incorporates the C-clip design.

Fiocchi and Coxon examined Daniel's bicycle following the accident and saw no damage to the front tire or wheel. The quick release was open. Norman Swalgren and Robert Knudson, Highland Park police officers, testified that they saw no damage to the tire or wheel assembly which might indicate a forced detachment from the quick release mechanism. Michael Fritz, Schwinn's investigator, also testified that he saw no damage to the front tire or wheel. Fritz testified further that Daniel would not have been injured if his bicycle had been equipped with the positive retention clips.

Fred DeLong testified for Schwinn as an expert based on his experience as a former bicycle racer and as an engineer. DeLong believed that the design of Daniel's bicycle was reasonable. DeLong also analyzed the forces involved in the sequence of events leading to the accident. He concluded that the front wheel struck an $8\frac{1}{2}$-inch-wide by two- to three-inch-deep depression on the crossing at a 15° to 20° angle from perpendicular. The impact caused the front wheel to deflect to the left approximately 57°. Daniel was able to keep the bicycle upright by pulling hard on the handlebars to the right. During this sequence, 284 pounds of force were exerted on the right fork tip. The forces placed on the fork tip freed the quick release, removed its

clamping force and permitted the wheel to release from the fork.

DeLong testified that the positive retention clips included on Schwinn's quick release wheels after 1976 provided an additional measure of safety. He had no opinion as to whether positive retention clips would have prevented the accident. DeLong believed the quick release hub was not secured as tightly as recommended by the owner's manual, but was adequately secured to keep the wheel engaged for normal riding conditions, including normal railroad crossings.

Schwinn engineering tests demonstrated that if the release is properly secured, it cannot be dislodged even by adverse road conditions. During some tests, the bicycles were in effect hurled against six-inch-high curbs. In other tests, the bicycles were tested on simulated road shocks lasting the equivalent of 97.7 continuous hours or 1,465 theoretical miles. If the adjusting nut was improperly tightened or the release lever was not properly closed, the wheel could be disengaged from the fork tips, causing the loss of the front wheel.

Schwinn stipulated at trial that between 1968 and 1985 it had received 131 complaints involving bicycles with quick release mechanisms where the front wheel disengaged while the bicycle was in motion. These complaints were received by Schwinn as early as 1968.

In 1977, Schwinn began to sell its quick release bicycles with a safety device, positive retention clips, designed to prevent front wheels from disengaging when the hub adjustment was loose or the lever was open. Frank Brilando, Schwinn's vice-president, designed the clips. On October 28, 1976, a patent application for the clips was filed. On August 1, 1978, a United States patent was issued.

Joseph Kostur testified for plaintiffs as an expert in the area of road and railroad maintenance and repair. Kostur found substantial vertical deviations between the tops of the rails and the crossing surface. Some of the deviations appeared to be approximately two inches, in violation of the relevant Illinois Commerce Commission order and rule that "the surface of the roadway shall be substantially flush with the top of the rails."

Kostur testified further that, based upon his review of photographs of the crossing, the maintenance problems throughout all areas of the crossing were created by age, deterioration, weather and use. The problems could be alleviated only by rehabilitation, not mere patchwork. Rehabilitation was feasible prior to September 4, 1976.

The Central Avenue railroad crossing in Highland Park was constructed in 1959, using gumwood timbers for the crossing surface. Maintenance was carried out on an "as needed" basis. In 1971, the railroad authorized the rebuilding of the crossing. The estimated cost

of the project was $8,870. The funds were included in the railroad's budget for that year, and completion of the project was scheduled for August 1971. In its 1971 authorizing document, the railroad recognized numerous complaints from the public about the crossing's poor condition. The rebuilding project was subsequently cancelled.

During 1974 and 1975, Highland Park officials wrote to the railroad several times concerning the crossing's being "very rough, with loose planks," which posed a "hazardous situation." Highland Park requested "corrective maintenance before serious injury is incurred." The railroad responded that it would continue day-to-day maintenance on the crossing.

For periods of time prior to September 4, 1976, defendant placed "slow orders" on this line in the area of the crossing, which was a reduction in the maximum speed trains were permitted to operate. Thus, from a high speed limit of 70 miles per hour, trains passing this crossing were required to reduce their speeds to a maximum of 30 or 40 miles per hour. These orders were necessitated by the condition of the crossing.

Glen Kerbs, an employee of the railroad, recalled that "slow orders" were in effect on the relevant area of the line from November 1976 through March 1977, and probably during the winter months in 1974 and 1976.

Jay Towmley and Michael Fritz, Schwinn employees, inspected and photographed the scene on September 17, 1976. The crossing was extremely rough. They rode a bicycle over the crossing several times, and found it difficult to maintain control of the bicycle. Fritz saw depressions three to four inches deep "in most cases" in the north half of the crossing. Towmley noted holes of $4\frac{1}{2}$ inches to 5 inches from the washouts to the rails, and $3\frac{1}{2}$ inches to 5 inches near the rail. The difference between the height of the timber that makes up the crossing surface and the top of the rail on the western track was 2 inches to $3\frac{1}{2}$ inches on the northern side of the crossing.

Coxon and Fiocchi testified that the surface of the crossing was generally uneven, with depressions as great as two to four inches between the top of the rail and the surface of the adjacent timbers. Fiocchi went to the crossing with his father on the day following the accident. They concluded the crossing was in very bad condition. The tops of the rails were two to four inches below the level of the timber surface.

In March 1977, six months after the accident, the railroad authorized the complete replacement of the gumwood crossing with a new asphalt crossing. As of March 8, 1977, the crossing was listed by the

railroad as the number one rehabilitation priority of the 2,000 crossings that comprised the Wisconsin Division of the railroad. The replacement was completed in June 1977.

G. Rex Nichelson testified as an expert for the railroad. Nichelson, an independent consultant formerly employed by the Illinois Department of Transportation and a professional engineer, testified that after viewing photographs taken shortly after the occurrence, he saw nothing to indicate four-inch vertical deviations between the rails and the adjacent timbers. The photographs showed the crossing to be reasonably safe and the rails and timbers to be substantially flush. He opined that the crossing would not be functional if the tops of the rails were depressed four inches below the adjacent crossing surfaces.

Peter Connena, the railroad's section foreman since 1954, testified that he was responsible for inspecting and maintaining the Central Avenue crossing since 1962. In 1971, the crossing was in good condition, with no rough track. In 1977, it was also in good condition, as it was at all times between 1971 and 1977. If there was a deviation between the top of a rail and the crossing surface, Connena would repair it. In his opinion, a deviation of one inch or more was not safe.

Norman Swalgren, Robert Knudson and John Karolzak, Highland Park police officers, testified that when driving across the tracks, the crossing did not feel rough. Swalgren testified that the rail was slightly lower than the top of the crossing surface. Swalgren recalled the surface deviations being no more than one-fourth to one-half of an inch. He made no measurements, and took no notes at the time of the accident, which took place nine years prior to the trial. If Swalgren had seen a defect or irregularity, however, he would have instructed the officers present to make notes.

The jury returned a verdict in favor of plaintiffs and against the railroad, and a verdict in favor of Schwinn and against plaintiffs. In an answer to a special interrogatory, the jury found that the bicycle involved was not in an unreasonably dangerous condition as manufactured in 1973 and that the bicycle's condition was not a proximate cause of Daniel's injuries.

The railroad first contends that it was denied a fair trial because the trial court improperly admitted evidence of the post-accident replacement of the crossing. Nine months after the accident, in June 1977, the railroad replaced the gumwood crossing constructed in 1959 with a blacktop crossing. The trial court denied the railroad's pretrial motion *in limine* to bar evidence of this replacement.

■ ■ Evidence of subsequent remedial measures is not admissible to prove negligence. (*Lundy v. Whiting Corp.* (1981), 93 Ill. App.

3d 244, 417 N.E.2d 154.) Evidence of post-occurrence changes is admissible in strict liability cases to show feasible alternatives, which is relevant to the dangerousness of the condition at the time of the accident. (*Collins v. Interroyal Corp.* (1984), 126 Ill. App. 3d 244, 466 N.E.2d 1191.) Evidence of subsequent remedial measures is also admissible in cases alleging wilful and wanton conduct. (126 Ill. App. 3d 244, 466 N.E.2d 1191.) This is particularly true where the railroad had notice of the damaged condition of its crossing, but failed to take corrective action until after serious injury occurred. (See *Stromquist v. Burlington Northern, Inc.* (1983), 112 Ill. App. 3d 37, 444 N.E.2d 1113; *Collins v. Interroyal Corp.* (1984), 126 Ill. App. 3d 244, 466 N.E.2d 1191; *First National Bank v. Illinois Central Gulf R.R. Co.* (1978), 62 Ill. App. 3d 36, 378 N.E.2d 1329.) Thus, such changes may not be used to show negligence, but may be introduced to show that defendant acted with conscious disregard for the safety of others. *Collins v. Interroyal Corp.* (1984), 126 Ill. App. 3d 244, 466 N.E.2d 1191.

■ In the present case, the wilful and wanton issue was withdrawn from the jury by agreement of the parties, but not until after plaintiffs rested their case. The railroad failed to move to strike the testimony regarding post-accident repairs, failed to move for an instruction to the jury to disregard the testimony or limit its applicability, and did not move for a mistrial. The railroad will not now be heard to complain of an error to which it consented. (See *Auton v. Logan Landfill, Inc.* (1984), 105 Ill. 2d 537, 475 N.E.2d 817; *Hazelwood v. Illinois Central Gulf R.R.* (1983), 114 Ill. App. 3d 703, 450 N.E.2d 1199.) Under these circumstances, the railroad was not entitled to rely solely on its prior motion *in limine* to preserve its objections. See *Knight v. Chicago & North Western Ry. Co.* (1954), 3 Ill. App. 2d 502, 123 N.E.2d 128.

■ Moreover, it is not clear that the evidence of post-occurrence changes prejudiced the railroad to such an extent that reversal is warranted. Generally, an error is not reversible unless it is shown that the error was substantially prejudicial and thereby unduly affected the outcome of the trial. (*Salvi v. Montgomery Ward & Co.* (1986), 140 Ill. App. 3d 896, 489 N.E.2d 394.) The party asserting the error must provide a clear showing of prejudice. A court of review will not presume that an error affected the outcome of the trial. (*Salvi v. Montgomery Ward & Co.* (1986), 140 Ill. App. 3d 896, 489 N.E.2d 394, citing *Kyowski v. Burns* (1979), 70 Ill. App. 3d 1009, 388 N.E.2d 770.) Here, the jury heard evidence of post-accident repairs as to both defendants, but returned a verdict against only the railroad. Furthermore, as we note herein, there was sufficient other evidence to sup-

port the jury's verdict. The railroad has failed to make a clear showing of prejudice.

■ The railroad next contends that the trial court erred in excluding photographs of the crossing it offered into evidence, and erred in admitting photographs of the crossing offered into evidence by plaintiffs. Whether or not photographs should be admitted is within the sound discretion of the trial court, and this court will not disturb that ruling on appeal absent a clear abuse of discretion. *Kyowski v. Burns* (1979), 70 Ill. App. 3d 1009, 388 N.E.2d 770.

■ The six photographs which the railroad sought to introduce all clearly indicated that Daniel was riding in the wrong direction on a one way street when he was injured. Prior to trial, the court had granted plaintiffs' motion *in limine* prohibiting any evidence that Daniel was riding his bicycle the wrong way on a one way street. (After plaintiffs rested, the railroad agreed that Daniel's negligence would not be submitted to the jury.) Seventeen photographs of the crossing were admitted into evidence during plaintiffs' case in chief. It is difficult to understand, and the railroad has inadequately portrayed to us, how it was prejudiced by the omission of six additional photographs of the single crossing.

The railroad maintains that the exclusion of six photographs was inconsistent with the trial court's admission of two other photographs offered by plaintiffs which depict the southwest corner of the crossing and show serious surface irregularities, including a large pothole surrounding one of the rails. In view of the fact that the accident did not occur on that particular corner of the crossing, we cannot say as a matter of law that the existence of the pothole on a different section of the crossing was highly prejudicial or requires reversal.

■ ■ The railroad also argues that the trial court erred in permitting improper argument by Schwinn's counsel regarding two missing witnesses. In its answers to plaintiffs' interrogatories, the railroad identified John McClellan, one of its district claims agents, as an individual having knowledge of the condition of the crossing after the incident, and identified John Forrester as its expert witness in bicycle construction and accident reconstruction. Over the railroad's objection, Schwinn's counsel was permitted to read these answers to interrogatories to the jury and comment during closing argument on the absence of these witnesses. The railroad argues that the jury was left "with the grossly prejudicial impression that the testimony of these witnesses would have been adverse" to the railroad. The railroad complains that while Schwinn, not plaintiffs, induced these errors, plaintiffs "were certainly the beneficiaries of these errors."

In closing argument, Schwinn's counsel commented that McClellan was at the accident site two days after the accident and could have testified to the condition of the crossing, but he was not called to testify by the railroad. Counsel continued, "And don't you think that if he had something to offer, if he had something that would support the railroad's position in this case, that he would have been brought in to testify in this case?"

Where an individual has knowledge of the facts and is accessible to a party, but is not called by that party, a presumption arises that his testimony would be adverse to that party if the witness was not equally available to the other party. As a result, references regarding that presumption may be made in closing arguments. (*Tonarelli v. Gibbons* (1984), 121 Ill. App. 3d 1042, 460 N.E.2d 464.) A witness is not considered equally available to a party if there is a likelihood that he would be biased against that party. (121 Ill. App. 3d 1042, 460 N.E.2d 464.) In the present case, McClellan was an employee of the railroad and had investigated the accident for the railroad, yet the railroad chose not to call him as a witness. There is a likelihood that he would have been biased in favor of the railroad, his employer, and thus we cannot say that McClellan was equally available to the parties. See *Donnelly v. Washington National Insurance Co.* (1985), 136 Ill. App. 3d 78, 482 N.E.2d 424 (trial court properly gave jury instruction regarding inference raised by defendant's failure to produce several employees as witnesses where defendant's employees were personally involved in defendant's actions in connection with plaintiff's claim).

The railroad also complains that its photographs were excluded, yet the court denied the railroad's motion *in limine* which would have prohibited plaintiffs or Schwinn from cross-examining McClellan regarding the existence of the same photographs. It argues that the ruling excluding the photographs but refusing to prohibit cross-examination regarding the existence of the photographs "cannot be reconciled and constituted prejudicial error." As we have discussed, the exclusion of the photographs did not constitute error. The railroad has failed to show how it was prejudiced by the denial of the motion *in limine* regarding cross-examination on this subject. Moreover, as McClellan was never called, the railroad was not prejudiced by any cross-examination of McClellan.

■ The railroad also contends that it was error to permit comment on the absence of Forrester. Forrester was solely under the control of the railroad. He was a California resident and could not be subpoenaed by Schwinn, and had already been hired by the railroad.

(See *Hollembaek v. Dominick's Finer Foods* (1985), 137 Ill. App. 3d 773, 484 N.E.2d 1237 (expert hired by defendant to examine plaintiff was under defendant's control for purpose of testifying and was thus unavailable to plaintiff as a witness).) A reasonably prudent party in the position of the railroad would have called this expert witness if it believed his testimony would be favorable. The railroad offered no reasonable excuse for not calling Forrester. (See *Tuttle v. Fruehauf Division* (1984), 122 Ill. App. 3d 835, 462 N.E.2d 645; *Scattone v. Clark* (1983), 120 Ill. App. 3d 290, 457 N.E.2d 1077.) No error occurred.

■ The railroad also complains that under Supreme Court Rules 212 and 213, Schwinn's counsel should not have been permitted to read the answer to the interrogatory naming McClellan, or permitted to disclose the fact that Forrester was retained as an expert for the railroad. Rule 213 provides that answers to interrogatories may be used in evidence to the same extent as a discovery deposition. (107 Ill. 2d R. 213.) Rule 212(a)(2) provides that discovery depositions may be used as an admission made by a party or its agent in the same manner as other admissions. Interrogatory answers may be admitted, therefore, for purposes of showing an admission of a party. *Tolman v. Wieboldt Stores, Inc.* (1967), 38 Ill. 2d 519, 233 N.E.2d 33.

■ In order for an admission to be admissible, however, it must be relevant to the issues. (*Cicale v. Aronson* (1969), 113 Ill. App. 2d 324, 252 N.E.2d 114.) A party's interrogatory answers which admit there are certain witnesses is of no relevance unless it is shown they were under that party's control. (*Bunton v. Illinois Central R.R. Co.* (1957), 15 Ill. App. 2d 311, 146 N.E.2d 205.) We have found that Forrester and McClellan were under the railroad's control. Thus, the trial court did not err in permitting Schwinn to read into evidence the interrogatory answers which identified McClellan and Forrester as witnesses.

■ The railroad next points to three alleged errors which, individually or cumulatively, resulted in prejudice and the denial of a fair trial. First, it argues that the jury was improperly instructed on the definition of "preponderance of the evidence" during *voir dire*. In its preliminary comments to the prospective jurors, the trial court distinguished the burdens of proof in a criminal case from a civil case. In explaining that the plaintiffs must prove its case by a preponderance of the evidence, the court stated:

"If at the conclusion of the evidence the scales remain equal, the plaintiff loses. If the scales tilt in favor of the defendants, of course, the plaintiff loses. However, if the scales tilt in favor

of the plaintiff ever so slightly, then the plaintiff wins. Clear?" The railroad maintains that this statement is an incorrect definition of a preponderance of the evidence and that the statement improperly minimizes plaintiffs' burden of proof.

Supreme Court Rule 234 provides that during the *voir dire* examination of prospective jurors, questions shall not directly or indirectly concern matters of law or instruction. (107 Ill. 2d R. 234.) The court may, however, acquaint prospective jurors with the general duties and responsibilities of jurors. (107 Ill. 2d R. 234.) While discussions concerning the law should be avoided during *voir dire*, we hold that no prejudicial error occurred here because the trial court properly instructed the jury as to the burden of proof at the end of the case. *Heiser v. Chastain* (1972), 6 Ill. App. 3d 552, 285 N.E.2d 601.

The railroad's reliance on *Molloy v. Chicago Rapid Transit Co.* (1929), 335 Ill. 164, 166 N.E. 530, and *Teter v. Spooner* (1922), 305 Ill. 198, 137 N.E. 129, is misplaced. Those cases concerned the inclusion and definition of "preponderance" in jury instructions, and did not concern *voir dire* comments. We conclude that the *voir dire* comments did not deprive the railroad of a fair trial.

■■ The railroad next maintains that the trial court erred in precluding the railroad from arguing that tampering with the front wheel caused the quick release mechanism to open prior to Daniel's arrival at the crossing. The record reveals no evidence of tampering. Daniel testified that he checked his quick release prior to riding the bicycle. Coxon saw the front wheel of the bicycle lifted and suspended in air before they rode away from the theatre, and the secured wheel did not fall off. The railroad offered no evidence to refute this testimony, and we cannot say the trial court abused its discretion in precluding this potentially confusing argument which could be based only upon speculation and conjecture. See *Reynolds v. Alton & Southern Ry. Co.* (1983), 115 Ill. App. 3d 88, 450 N.E.2d 402.

■■ ■ The railroad argues further that the trial court erred in allowing plaintiffs' witness Joseph Kostur to testify as an expert on railroad matters. The railroad particularly points to the fact that Kostur had no engineering degree and had no training or experience in the design or construction of railroad grade crossings. Whether or not a witness is qualified as an expert is within the discretion of the trial court. (*Sullivan v. Berardi* (1980), 80 Ill. App. 3d 417, 399 N.E.2d 708.) A witness whose expertise is based on practical experience instead of on academic or scientific knowledge is no less qualified as an expert. *Bartsch v. Gordon N. Plumb, Inc.* (1985), 138 Ill. App. 3d 188, 485 N.E.2d 1105.

 Kostur studied engineering in school and in the army, including a course in design and construction relating to railroads and other structures. Since 1958, Kostur has worked for the Illinois Department of Transportation as an assistant resident engineer, resident engineer, survey party chief, and chief inspector. As part of his duties, Kostur was charged with overseeing numerous highway construction projects, some of which involved railroad crossings. Furthermore, as part of his duties from 1969 to the present, Kostur engaged in safety work related to railroads and securing permits to close sections of the State highway for the purpose of effectuating a grade crossing reconstruction. This required him to inspect grade crossings to investigate complaints of roughness. Kostur testified regarding his familiarity with railroad grade crossings and the problems encountered by automobiles, pedestrians or bicycles traveling over the crossings. In light of this background, we cannot say the trial court abused its discretion in permitting Kostur to testify as an expert. The testimony offered by Kostur which the railroad now complains of, therefore, would go to the weight and not to the admissibility of his opinions.

 █ The railroad next contends that the verdict for plaintiffs is excessive as a matter of law. An award of damages is not subject to scientific computation and thus it is a matter for a jury's determination. (*Macias v. Inland Steel Co.* (1986), 147 Ill. App. 3d 411, 497 N.E.2d 1206; *Dooley v. Darling* (1975), 26 Ill. App. 3d 342, 324 N.E.2d 684.) Where the jury's verdict is not the result of prejudice, sympathy or passion, it will not be set aside. *Dooley v. Darling* (1975), 26 Ill. App. 3d 342, 324 N.E.2d 684.

 Here, the jury was presented with evidence regarding Daniel's lengthy hospitalization which included several operations, including one where one-third of the right side of his brain was removed. While he can dress and bathe, he has a serious deficiency in terms of higher level abilities, and suffers from an impaired ability to function in day-to-day social interaction. For example, Daniel is socially aggressive with strangers, makes inappropriate jokes, and has grave difficulty in controlling his emotional behavior. He cannot control his facial expressions and gestures to reflect an appropriate mood. He needs supervision and management on a daily basis. In addition, there was evidence offered regarding Daniel's physical problems, including facial deformities, impaired speech, unstable and abnormal gait, left-sided hemiparesis and spasticity, clawed left hand, deformed left foot, blindness in right eye, and loss of half of his visual field in left eye.

The railroad, in its attack on the amount of damages awarded, asserts that Daniel was able to complete high school and had enrolled at

a college in a sociology and a math course. The railroad ignores the evidence that Daniel finished high school through the special education department. In his first attempt to attend college, Daniel flunked out. At the time of trial, he was taking a remedial mathematics course and an introduction to sociology course at the College of Lake County. A professor from the college testified that it would not be realistic for Daniel to continue school.

After reviewing all the evidence presented to the jury, we hold that the verdict is not so large as to shock the judicial conscience. Therefore we will not disturb the damages award made in favor of plaintiffs.

■■ ■ We now address issues raised by plaintiffs in their appeal from the judgment entered on a verdict in favor of Schwinn and against plaintiffs.

Plaintiffs first contend that they were denied a fair trial as a result of Schwinn's introduction of state of the art evidence and evidence of bicycle sales. The trial court entered an *in limine* order prohibiting Schwinn from introducing evidence of the state of the art of positive retention devices. (See *Nave v. Rainbo Tire Service, Inc.* (1984), 123 Ill. App. 3d 585, 462 N.E.2d 620 (where court held negligence concepts have no place in action for strict product liability).) Plaintiffs point to one remark elicited from an adverse witness by plaintiffs' counsel. Brilando, Schwinn's director of engineering, was asked whether it was true that Schwinn did not sell a retention device on a quick release wheel until 1977. Brilando replied, "Yes. We didn't nor did anyone else."

In order for the violation of an *in limine* order to serve as the basis for a new trial, the order must be specific in its prohibitions, and violations must be clear. (*Reidelberger v. Highland Body Shop, Inc.* (1979), 79 Ill. App. 3d 1138, 399 N.E.2d 247, *aff'd* (1981), 83 Ill. 2d 545, 416 N.E.2d 268.) We cannot say that the four superfluous words spoken in a trial which fills 4,600 pages of transcript prejudiced plaintiffs so as to warrant the granting of a new trial. The brief statement was a response to a question asked by plaintiffs' counsel, and plaintiffs did not move to strike the answer or move for a limiting instruction. Plaintiffs were not deprived of a fair trial. See *Bradley v. Caterpillar Tractor Co.* (1979), 75 Ill. App. 3d 890, 394 N.E.2d 825.

■■■ Plaintiffs next argue that they were denied a fair trial when the trial court denied plaintiffs' motion to bar Schwinn from introducing testimony regarding the number of bicycles it sold with quick releases but without positive retention devices. Plaintiffs maintain that this evidence permitted Schwinn to raise the inference that

the number of bicycles sold in relation to the number of accidents caused by the failure to include a positive retention device on the quick release front wheels showed that the design was not defective.

Plaintiffs were permitted to introduce statistics that by the end of 1972, prior to the 1973 manufacture of Daniel's bicycle, Schwinn had received notice of 16 incidents where a front wheel of a bicycle using the quick release device had disengaged from the frame. By 1976, when Daniel's accident occurred, Schwinn had received notice of 66 instances of wheel disengagement. In addition, plaintiffs offered evidence of 131 similar accidents to demonstrate a common, dangerous propensity of the bicycle. That evidence was based upon a stipulation entered into between plaintiffs' counsel and counsel for Schwinn. Subsequently, the trial court permitted Schwinn to introduce evidence that only a fraction of 1% (.0055) of the 1,198,501 quick-release bicycles sold had reported wheel disengagement.

Evidence of the absence of prior accidents is generally admissible only where the offering party establishes the necessary foundation that the absence occurred where the same product was used under conditions substantially similar to those faced by plaintiff in the pending suit. (*Salvi v. Montgomery Ward & Co.* (1986), 140 Ill. App. 3d 896, 489 N.E.2d 394.) If other accidents are admissible to show the existence of a particular defect or condition, or that a situation is dangerous, or that defendant knew or should have known of the danger, then the absence of accidents during a period of similar exposure and experience would generally be receivable to show the nonexistence of these facts. (See *Darrough v. White Motor Co.* (1979), 74 Ill. App. 3d 560, 393 N.E.2d 122, citing McCormick, Evidence sec. 200, at 476 (2d ed. 1972).) Here, the issue was whether the design of the bicycle and quick release mechanism was defectively dangerous. Evidence that many others had used the bicycle without incident would be relevant to that issue.

It would have been totally inconsistent to permit plaintiffs to introduce evidence of similar prior accidents and then prohibit Schwinn from introducing rebuttal evidence of the number of similar bicycles sold and the absence of reported problems with the quick release mechanism. Such evidence is highly relevant to the issue of causation. See *Lowe v. Norfolk & Western Ry. Co.* (1984), 124 Ill. App. 3d 80, 463 N.E.2d 792.

■■■ Both the railroad and plaintiffs contend that Schwinn's use of a juror to participate in an in-court demonstration was highly improper and tainted the impartiality of the jury. The record shows that Schwinn's expert, DeLong, conducted a "spin test" before the jury

where he held the front wheel of the bicycle, fork and handlebars by the stem, spun the wheel and exerted a slight twisting motion on the stem. The intent of the demonstration was to show the gyroscopic effect of the movement. Schwinn's counsel then asked the trial court whether a juror could participate in the demonstration. The court inquired whether there was any objection. As there was no objection, the court permitted the demonstration. DeLong stated that when the wheel was spun at an angle, it "should throw it over to this direction to the right." The juror tried it, and said, "It does throw it off. *** There is a force."

Initially we note that plaintiffs and the railroad waived their rights to raise this issue on appeal because they failed to object at trial when the trial court expressly asked the parties whether they had any objection to the demonstration. (See *Considine v. Hill* (1959), 22 Ill. App. 2d 83, 159 N.E.2d 15.) Moreover, it is within the trial court's discretion to determine whether demonstrative evidence may be permitted for the purpose of clarifying expert testimony. (*Hubbard v. McDonough Power Equipment, Inc.* (1980), 83 Ill. App. 3d 272, 404 N.E.2d 311.) We cannot say that the brief exchange between the juror and the expert witness tainted the impartiality of the jury, particularly in view of the fact that the demonstration model in question was sent back to the jury and was equally available to all jurors during their deliberations.

Plaintiffs next contend that the trial court erred when it gave the jury an instruction tendered by Schwinn on the feasibility of alternative designs. Plaintiffs maintain that the instruction erroneously placed the burden of proving such feasibility upon plaintiffs. The instruction read:

> "There is no duty upon the manufacturer of the bicycle to manufacture the bicycle with a different design if the different design is not feasible. Feasibility includes not only elements of economy, effectiveness and practicality, but also technological possibilities under the state of the manufacturing art at the time the product was manufactured in 1973."

This instruction includes the same language approved by the court in *Kerns v. Engelke* (1979), 76 Ill. 2d 154, 390 N.E.2d 859. The court in *Kerns* held that the instruction correctly apprised the jury of the Illinois law on this issue. (See also *Robertson v. General Tire & Rubber Co.* (1984), 123 Ill. App. 3d 11, 462 N.E.2d 706 (failure to give this instruction, which accurately states the law as to a strict liability count, did not require court to disturb jury verdict on negligent count).) Plaintiffs chose to prove the unreasonableness of the bicycle

by introducing evidence of the existence of a safer, feasible design. (See *Palmer v. Avco Distributing Corp.* (1980), 82 Ill. 2d 211, 412 N.E.2d 959 (finding this is one of the two typical methods of proving a product is unreasonably dangerous).) We find that the jury instruction recognizes the law of Illinois regarding feasibility without improperly placing a burden of proof on plaintiffs as to feasibility.

The cases cited by plaintiffs do not hold to the contrary. (See *Ogg v. City of Springfield* (1984), 121 Ill. App. 3d 25, 458 N.E.2d 1331; *Seward v. Griffin* (1983), 116 Ill. App. 3d 749, 452 N.E.2d 558.) Those cases did not involve jury instructions. Instead, they merely cite the general rule that evidence of safer, feasible alternatives is not an essential element of a product liability case which the plaintiff is required to prove.

■ Plaintiffs contend further that they were denied a fair trial by the improper and prejudicial closing argument of Schwinn's counsel. Schwinn's counsel commented that "Schwinn isn't the largest quick release supplier of bicycles in this country and the only one that was brought in for you to be—for you to compare—." In response to an objection by plaintiffs' counsel, Schwinn's counsel responded, "I didn't say they were the smallest. I said they weren't the largest." Plaintiffs now argue that this comment appeals to the "passion and prejudice of the jury by suggesting that defendant was unable to afford to make its product safe or to afford to pay a judgment." We cannot agree that the partially completed comment plaintiffs complain of raised such an inference.

■ Plaintiffs also point to Schwinn's reference to the absence of governmental regulations regarding the use of positive retention devices, in comparison to the regulations imposed with regard to childproof caps on aspirin bottles and seat belts in cars. The trial court did not abuse its discretion in permitting the argument, noting that the jury understood it was argument and not evidence. Thus, the court prevented any possibility that the jury was misled by the comment. (See *Lebrecht v. Tuli* (1985), 130 Ill. App. 3d 457, 472 N.E.2d 1322.) We find, therefore, that the comments complained of did not prevent plaintiffs from receiving a fair trial.

Plaintiffs next contend that the verdict and the answer to the special interrogatory in favor of Schwinn were against the manifest weight of the evidence. They point to testimony, *e.g.,* from Hazard, who testified for plaintiffs that the quick release mechanism was disengaged when the wheel came off. He opined that if the quick release mechanism on the bicycle had been properly adjusted, the wheel would not have disengaged going over the railroad crossing. Schwinn,

however, offered its own experts' testimony, which conflicted with that of Hazard.

■■■ ■ Where the evidence is conflicting, in order for a verdict to be contrary to the manifest weight of the evidence an opposite conclusion must be clearly evident. (*Raabe v. Maushak* (1977), 55 Ill. App. 3d 169, 371 N.E.2d 96.) A jury verdict will not be disturbed unless it is palpably erroneous, the opposite verdict is clearly compelled, or findings appear to be unreasonable, arbitrary, and not based on the evidence. (*Bass v. Washington Kinney Co.* (1983), 119 Ill. App. 3d 713, 457 N.E.2d 85.) While there was conflicting testimony regarding the need for an additional safety mechanism such as retention clips, it is the function of the jury to evaluate the weight of the evidence and assess the credibility of the witnesses. This court will not reevaluate the evidence and set aside a jury verdict merely because it could have reached a different conclusion. See *Bass v. Washington Kinney Co.* (1983), 119 Ill. App. 3d 713, 457 N.E.2d 85.

■■■ There was sufficient evidence offered in the present case to support the jury's finding that the design of the bicycle was not the proximate cause of the accident. Several witnesses testified that Daniel knew how to operate the mechanism, and that it was in fact securely fastened just prior to the accident. Generally, there was expert testimony that the bicycle design was safe because the quick release mechanism, when properly secured, would remain closed even if the bicycle is ridden over a bumpy road. The 1973 bicycle exceeded all governmental and industrial standards for wheel retention.

In addition, Schwinn had developed three means of positive retention by 1973, but all of them were rejected. As to the first type, expert witnesses for both plaintiffs and Schwinn testified that the system invented for Schwinn in 1968 was used only on solid axle bicycles because it was too cumbersome for use on quick release mechanisms.

The "C fork tip" design, the second form of positive retention developed by Schwinn, was not considered a viable design and was never used. The C-clip design, the third form of positive retention developed by Schwinn, was not easy to operate and it did not meet the engineering criteria established by Schwinn. Furthermore, the 1985 Raleigh bicycle C-clip method of positive retention was such that it could not resist side load forces such as that involved in Daniel's accident. Thus, there was sufficient evidence for the jury to conclude that the bicycle's design was not unreasonably dangerous and that in 1973 a safer, feasible alternative was not available to Schwinn.

In light of this and related evidence, we conclude that the jury verdict in favor of Schwinn was amply supported by the record, and

was not contrary to the manifest weight of the evidence.

For the foregoing reasons, the judgment of the circuit court of Cook County in favor of plaintiffs against defendant Chicago and North Western Transportation Company in the amount of $8,235,000 is affirmed. The judgment in favor of Schwinn Bicycle Company against plaintiffs is also affirmed.

Judgments affirmed.

WHITE and FREEMAN, JJ., concur.