MARVEL ENGINEERING COMPANY, Plaintiff-Appellee and Cross-Appellant, *v.* COMMERCIAL UNION INSURANCE COMPANY, Defendant-Appellant and Cross-Appellee.

Second District No. 82—634

Opinion filed October 14, 1983.

James T. Ferrini and William J. Schaffle, both of Clausen, Miller, Gorman, Caffrey & Witous, of Chicago, for appellant.

Jenner & Block, of Chicago (Thomas R. Mulroy, Jr., Michael B. Brohman, and Debra E. Abelson, legal assistant, of counsel), for appellee.

PRESIDING JUSTICE SEIDENFELD delivered the opinion of the court:

Marvel Engineering Company recovered a judgment against the Commercial Union Insurance Company based on a jury verdict in the amount of $176,484.35 for its inventory loss and $1,948,139.44 for its business interruption loss. Commercial Union appeals. Marvel cross-appeals from that portion of the trial court's judgment which denied prejudgment interest and attorney fees.

Plaintiff Marvel Engineering Company is a Delaware Corporation licensed to do business in Illinois. It manufactures, assembles, and sells hydraulic filter systems which remove unwanted contaminants. In 1974 its main plant was in Skokie. In 1962, Forrest Niccum purchased the company and became president and sole shareholder.

In 1974, Marvel had four affiliated support companies. Mayaguez and Meco, Inc., in Puerto Rico, supplied inventory items exclusively to Marvel. Ring Fabricators, Inc., which conducted some of its operations in Mountainair, New Mexico, manufactured and assembled parts. Marvel Engineering of New Mexico, or "Mescalero," a wholly owned subsidiary of Marvel, was a machine shop and assembly operation.

On December 11, 1974, Marvel's Skokie plant was struck by a fire which burned for about 10 hours. The fire completely destroyed the second floor and caused extensive damage to the plant's machinery. All of the inventory stored on the second floor was destroyed or damaged, and most of the first floor inventory suffered extensive water damage.

At the time of the fire, Marvel was carrying a paid up insurance policy from defendant, Commercial Union, for $4.3 million. The policy covered losses caused by fire, including building loss, inventory loss, machinery and equipment loss, and business interruption loss.

Marvel notified Commercial Union of its loss and on December 16, 1974, Forrest Niccum owner of Marvel met at the Skokie plant with Howard King of the General Adjustment Bureau, the firm hired by Commercial Union to adjust Marvel's fire loss. The two agreed on a 13-point "program" for Marvel to follow in coping with the fire loss. In line with King's suggestion, Marvel's bookkeepers established a new special "900" account for fire losses.

Marvel and its employees took steps to enable the company to resume normal operations. Employees helped to repair and replace damaged goods and equipment and clean up the premises, transport damaged inventory to an Elk Grove Village warehouse for salvage, make emergency deliveries to customers, and perform bookkeeping work, including working with Commercial Union's retained accountants reviewing documentation relevant to fire losses.

With the approval of Howard King, Marvel transferred production of paper filter elements to the Mountainair facility and, beginning in 1975, purchased all of its paper filter elements from Mountainair, paying the latter a "processing charge" for production. Marvel also directed certain machine shop operations to Mescalero, with King's approval. On or about December 31, 1974, Marvel conducted a year-end inventory. The inventory as of the time of the fire was calculated by adding shipment of goods made and subtracting goods received between the date of the fire and the end of the year.

In 1974, Marvel produced all of its finished products at its Skokie plant. The plant had a full first floor and, at the east end of the building, a partial second floor. In 1974, Marvel experienced problems find-

ing storage space at its Skokie plant. By late 1974, the premises had become so crowded that aisles were narrowed and the plant was virtually full. To alleviate the problem Marvel, in late 1974, started storing much of its inventory at warehouses in Chicago, Bensenville and Franklin Park. There was testimony that the Skokie premises were almost full about a week before the fire in December.

Commercial Union's accountants, Johnson, Atwater & Co. (JACO), reviewed the Marvel fire loss and the relevant books, records, and documents at the Skokie plant for about one year (summer of 1975 through July of 1976).

On March 9, 1976, Marvel filed its claims with Commercial Union for (1) building, (2) machinery, (3) inventory and (4) business interruption. Marvel submitted sworn statements in proof of loss detailing the inventory and business interruption claims.

Marvel's building and machinery claims were settled with Commercial Union, which paid $220,901 for the former and $183,904 for the latter.

The proofs of loss gave the inventory claim as $935,065.97 and the business interruption claim as $2,325,768.11, which was later reduced to $2,223,000. The business interruption costs were broken down into $429,487 for labor, $1,544,024.81 for "other costs," and $352,256.00 for lost profits. Among the "other costs" were $69,594.20 for "trucking charges."

Commercial Union paid only $582,097.27 of the claimed inventory loss. It contended that Marvel had insured less than 80% of the value of its inventory at the Skokie plant and that the policy allowed Marvel to recover only a percentage of its total loss. Thus, according to Commercial Union, Marvel, which insured the inventory at its Skokie plant for $1 million, undervalued this inventory in calculating the inventory claim. Commercial Union refused to pay any of the claimed business interruption loss.

On November 8, 1976, Marvel filed suit against Commercial Union, demanding $352,968.70 for inventory loss and $2,272,344.75 for the business interruption loss. Commercial Union's answer alleged, as a defense to the claim, that the entire policy was void because the proofs of loss fraudulently misstated the amount of loss and that Marvel deliberately underestimated the value of its inventory at the Skokie premises on the day of the fire in order to avoid the co-insurance clause which would have resulted in reduction in coverage.

## I. THE APPEAL

The sole issue on appeal is whether the trial court committed re-

versible error in granting Marvel's motion *in limine*, and in denying offers of proof during trial, of a group of exhibits known as the "Humphrey documents" which, according to Commercial Union, falsely documented charges in the amount of $69,861 claimed to be paid for trucking expenses resulting from the fire. The essential question is whether the trial judge in ruling on the foundation for the admission of the Humphrey documents, which appear to be clearly altered, was required to decide questions of fact which were properly for the jury.

Under policy provisions voiding coverage if the insured wilfully conceals any material fact, or in the case of fraud or false swearing, courts will deny recovery to an insured who has made deliberate material misstatements in the sworn proof of loss. (*Folk v. National Ben Franklin Insurance Co.* (1976), 45 Ill. App. 3d 595, 599.) Even substantial differences, however, between an original proof-of-loss estimate and the eventual jury award will not prevent a jury from properly finding that no fraud or false swearing occurred. *Nagel-Taylor Automotive Supplies, Inc. v. Aetna Casualty & Surety Co.* (1980), 81 Ill. App. 3d 607, 611.

Commercial Union argues that if it were permitted to go into the Humphrey documents, the jury could have been shown that the claim was not a matter of business judgment but fraudulent, and reflecting on both the trucking claim and the remainder of the claim.

The parties agree that the relevance of the Humphrey documents is "conditional," dependent on whether the documents were actually submitted in support of the claim. They also agree that Illinois law on the question whether the condition has been fulfilled is the same as under Rule 104(b) of the Federal Rules of Evidence, which provides that "[w]hen the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition." Fed. R. Evid. 104(b) (1978). See *People v. Munoz* (1979), 70 Ill. App. 3d 76; *United States v. 478.34 Acres of Land, Tract No. 400* (6th Cir. 1978), 578 F.2d 156; *United States v. Beechum* (5th Cir. 1978), 582 F.2d 898, 913; McCormick, Evidence sec. 53, at 124-25 (2d ed. 1972).

The issue is thus whether Commercial Union offered sufficient evidence that the Humphrey documents were submitted in support of the claim.

In the trial of the case the jury was given evidence that the $69,869.61 claimed by Marvel for trucking charges was arrived at by using a percentage of three fire related accounts "Freight in," at

33%, or $13,713.99; "shipping supplies and equipment," at 66%, or $44,614.53, and "Freight out," at 33%, or $11,541.09, totaling $69,869.61. In substance, the freight charges were said to represent the total cost for both freight and packaging incurred by Marvel in shipping material after the fire to Mountainair and Mescalero. Supporting original vouchers were submitted with relation to these accounts.

■ Defendant's exhibit 318 is a voucher evidencing payment to Humphrey in the amount of $13,000; its exhibit 317 is a voucher to Humphrey reflecting payment by check of $2,700, totaling $15,700. According to the testimony of defendant's auditor, Geiling, he was given a folder which he said consisted of the two vouchers totaling $15,700 and nine invoices purported to have been for services rendered by Humphrey to Marvel in 1975. One is for $580, each of the other eight are for the identical amounts of $1,890, totaling $15,700, the same as the total of the two vouchers. Six of the eight identical invoices, which are photocopies, are, with the exception of different dates which appear to have been superimposed on the copies, virtually identical in amount, description and script. A fact finder could readily infer that the documents were counterfeits prepared by copying a genuine original and making changes in the copies.

The trial judge's denial of admission of the Humphrey documents was based on the affidavits and testimony heard outside the presence of the jury. He found that an inadequate showing had been made based on the totality of the evidence that the documents "are relevant to the ultimate presentation of the claim, attached or made a part of the proof of loss that was ultimately submitted to the carrier." The judge also commented that the documents "almost contain smoke with prejudice that permeates it [sic]." He stated that there were gaps in the proof that they were presented in support of the claim and if the documents were submitted "their prejudice would outweigh any probative value."

■ Where the application of a particular rule of evidence depends upon the existence of a condition, here whether the Humphrey documents were submitted in support of the claim against the insurer, the judge must first determine whether the condition actually exists. Thus, to some extent, the judge acts as a trier of fact. (Fed. R. Evid. 104(a), (b), Advisory Committee Notes, at 40.) "The judge makes a preliminary determination whether the foundation evidence is sufficient to find a fulfillment of the condition. If so, the item is admitted. If after all the evidence on the issue is in, pro and con, the jury could reasonably conclude that fulfillment of the condition is not estab-

lished, the issue is for them." (Advisory Committee Notes, at 42.) Thus, if the jury could not reasonably find the preliminary fact to exist, the judge may withdraw the question from the jury. *United States v. Beechum* (5th Cir. 1978), 582 F.2d 898, 913.

Supporting documents were not attached to the proof of loss as filed with the insurance company. The JACO auditors were in Marvel's offices working on the claim and apparently with access to all of Marvel's records for more than a year prior to the company's denial of certain aspects of the claim.

At the initial evidentiary hearing, Sharon Thomas Kirby, president of Marvel since March 1977, stated that she never submitted any of the documents in defendant's exhibits 317, 318 or group 319 to JACO employees in support of the business interruption claim and that no one from JACO ever asked her whether the Humphrey invoices were submitted in support of the claim. She stated that never in examining Marvel's files did she see the two vouchers attached to the Humphrey documents. Her sworn affidavit reiterated these assertions.

Robert Meyer, Marvel's counsel, who was directly working on the claim with the auditors, testified that the Humphrey documents were not submitted in support of the claim and that in fact he never saw them or knew them prior to submitting the claim.

Geiling, a JACO auditor, said that on May 27, 1976, Meyer gave him a folder in which he found the Humphrey copies which file, Meyer represented, contained "partial documentary support" for the trucking charges. The file was a thick one and included other than fire related matters, but according to Geiling contained the Humphrey copies and the two vouchers totaling $15,700. Geiling testified that Meyer did not specifically state that the Humphrey copies were in support of the claim, that the entire file was submitted in support of the claim, or that any Marvel representative told him that the copies were in support of the claim. In the long interval of more than a year and a half between the beginning of the audit at the Marvel plant by JACO and the litigation Geiling said he did not show the Humphrey copies to any Marvel representative to determine whether they were part of the claim. Matson, Geiling's supervisor, stated that the file contained a number of invoices which were not offered in support of the claim. Matson also acknowledged that there were prefire vouchers in the file relating to 1974 and early 1975 which he knew were not part of the claim.

Michael Wilson testified for defendant that "as far as he could remember" the Humphrey copies were in the file when it was handed to him by Geiling. He said, however, that the "900" account (which pur-

ported to collect from the ledger the various items making up the trucking claim) was given to him as the general ledger support for the claim; and that the $69,869.51 item was "the total per the general ledger." In a conversation with Meyer, Wilson said he asked the basis for the figure and concluded "[w]ell he was referring to the support invoices that were provided us." Matson said he concluded that the Humphrey copies were used in the claim because he saw a calculation on a worksheet prepared by Marvel bookkeeper, Evelyn Alenik, which totaled $39,594.20 and included a $2,700 and a $13,000 figure. Matson, however, did not talk with Mrs. Alenik about how she arrived at the calculation or discuss it with her. Mrs. Alenik testifying at trial stated that the $2,700 and $13,000 vouchers were not posted to the fire-related account.

■ On this record we agree with the trial judge's conclusion that Commercial Union failed to establish a *prima facie* case to prove the condition that the Humphrey documents had been furnished by Marvel in support of its claim for trucking expenses. Marvel's witnesses who worked with JACO on the supplying of records directly testified that they had no knowledge of the existence of the Humphrey invoices and had never seen the Humphrey copies attached to the vouchers submitted in support of the claim. Mr. Meyer testified at length as to how he computed the trucking portion of the claim by using the percentage of the three accounts in the general ledger, explaining that the percentage calculation was used because only a portion of each voucher was for fire-related shipments to New Mexico while the remaining portion was for items that remained at Skokie, so that it was impossible to compute the trucking claim by simply using individual vouchers.

The evidence of a knowing submission of the Humphrey documents is essentially circumstantial. It involves JACO's auditor Geiling's testimony that he found the Humphrey documents in a large folder given to him which admittedly contained non-fire-related documents as well as fire-related documents. Geiling did not state that any representative of Marvel had ever told him that the Humphrey copies were either in the claim or offered in support of it. Norman Matson, Geiling's supervisor, admitted that the file contained invoices and vouchers which were not part of their offer in support of the insurance claim. JACO auditor, Wilson, testified that the general ledger, the "900" account was presented to him as the support for the claim. Matson's testimony as to a telephone conversation with Meyer and an inquiry as to how the $69,594.20 figure was arrived at was "Yes, well he was referring to the support invoices that were provided us ***.

The 'Humphrey trucking charge' invoices \*\*\*." It would seem that this would not be directly contradictory of Meyer's testimony that he at no time referred to the Humphrey trucking charges but would be Matson's inference from the fact he, Matson, knew that the Humphrey invoices were found in a large file of documents which were handed to him by Geiling. The circumstantial evidence which Commercial Union suggests ties in the Humphrey documents with the claimed false swearing are Matson's conclusion that the amounts of the invoices were used in the claim because he saw a calculation on the worksheet prepared by Marvel bookkeeper Evelyn Alenik which totaled $39,594.20 and allegedly included a $2,700 and a $13,000 figure. He admitted, however, that he had never talked with Mrs. Alenik about how she arrived at her calculation, never discussed the calculation with Meyer and never determined from Meyer whether the calculation was included in the claim. Mrs. Alenik, called as a witness by Commercial Union, identified each voucher which supported the items in her worksheet calculation and testified that none of the vouchers, including the $2,700 and the $13,000, was posted to the fire-related account.

Counsel for Commercial Union has argued that the Humphrey invoices were put forth originally as separate claims so that the checks used to pay personal expenditures of Forrest Niccum would be drawn into and supported as part of the operation for trucking to Mountainair, and that they amounted to fraudulent evidence because $13,000 and the $2,700 were actually expenditures for Forrest Niccum personally and not fire-related business costs.

The record, however, does not support this argument. There is no evidence offered to show that the items were personal expenditures of Niccum, and Commercial Union's citation to the record does not support the argument.

The evidence before the trial court on the motion *in limine* and the various offers of proof warrant the conclusion that among the many thousands of documents which JACO had been given, a set of false documents was included, which, it should be noted, were not disclosed to Marvel nor any connection with the claim discussed with Marvel until more than four years after the proof of loss had been filed and more than six years following the fire. As Commercial Union's counsel argues, there was no burden on the insurance company to point out to Marvel what documents it might rely upon in defense of the claim. However, the silence concerning the items is difficult to reconcile with the ongoing discussions with Marvel as to all portions of the insurance claim.

■ In the circumstances the trial judge could properly find that if the jury had been given the facts which were before the judge it could not have reasonably concluded that the Humphrey documents had been offered in support of Marvel's claim. *United States v. Beechum* (5th Cir. 1978), 582 F.2d 898, 913.

Commercial Union has argued extensively that the inability to introduce the Humphrey documents (although affecting only $15,700 in trucking charges of $69,869.61 in the context of a business interruption of more than $2 million, allowed by the jury in the amount somewhat less) was the critical factor in the case. Yet, while Commercial Union charges Marvel with extensive fraud throughout in overstating all of the claims of loss, no issue has been presented based on the manifest weight of the evidence. There was a working relationship between the auditors and Marvel. The insurer's auditors also had access to all of Marvel's records over a long period of time. The jury was presented with Commercial Union's theory of fraud and was properly instructed. The claims were reduced but the jury found no fraud. We conclude that the verdict should stand.

## II

■ On cross-appeal, Marvel urges that the trial court should have granted its petition for prejudgment interest on the award pursuant to section 2 of the Interest Act (Ill. Rev. Stat. 1981, ch. 17, par. 6402). Section 2 provides that creditors shall be allowed interest at 5% annually for money that becomes due on "any bond, bail, promissory note, or instrument of writing." The parties agree that the policy here is an "instrument of writing." (See *DiLeo v. United States Fidelity & Guaranty Co.* (1969), 109 Ill. App. 2d 28, 44.) Marvel argues that it became entitled to the amount due on or about May 8, 1976, as the policy's "when loss payable" provision stated that payment was due 60 days after receipt of the proof of loss, March 9, 1976.

Commercial Union argues first that the policy did not make the money due by this date because it specified that the amount of loss became payable 60 days after proof of loss was received *and* ascertainment of the loss was made either by written agreement or the filing of an award by Commercial Union. However, neither party requested an appraisal in this case after Commercial Union rejected Marvel's proof of loss and refused to pay any of the claim that formed the subject matter of this suit because of alleged irregularities and disputes over the amounts claimed. Commercial Union itself was thus responsible for the delay in determining the amount due, and, though it had a right to contest its liability and the amount of its liability, its

conduct amounted to a waiver of the contractual language on which it relies. *Travelers Fire Insurance Co. v. Ranney-Davis Mercantile Co.* (10th Cir. 1949), 173 F.2d 844, 852; *Craigie v. Firemen's Insurance Co.* (D. Minn. 1961), 191 F. Supp. 710, 715-16.

■■ ■ Nonetheless, the trial court properly denied prejudgment interest. For recovery of such interest, the sum due must be liquidated or subject to easy determination by calculation or computation. (*North Shore Marine, Inc. v. Engel* (1980), 81 Ill. App. 3d 530, 535; *First National Bank Co. v. Insurance Co. of North America* (7th Cir. 1979), 606 F.2d 760, 769-70.) The sum recovered by Marvel was not in this category. The extent of a business interruption loss, as several courts have recognized, depends on many factors, and is not a simple matter of calculation. (*Royal Crown Plastics & Sales, Inc. v. Motorists Mutual Insurance Co.* (1976), 51 Ohio App. 2d 79, 82, 366 N.E.2d 294, 296; *Esgro Central, Inc. v. General Insurance Company of America* (1971), 20 Cal. App. 3d 1054, 1063, 98 Cal. Rptr. 153, 159; *Travelers Indemnity Co. v. Pollard Friendly Ford Co.* (Tex. Civ. App. 1974), 512 S.W.2d 375, 383-84.) The business interruption loss was dependent on econometric analyses, estimates of expenses such as trucking expenses and the cost of transferring some of Marvel's operations to Ring of Mountainair, and exercise of accountants' discretion. Marvel revised its business interruption claim and its trucking charge claim, and the jury awarded it substantially less than either its claimed inventory loss or business interruption loss. (See *Farwell Construction Co. v. Ticktin* (1980), 84 Ill. App. 3d 791, 809-10.) The trial court therefore did not err in denying prejudgment interest.

## III

■■ Marvel argues that it was entitled to prejudgment interest because of Commercial Union's unreasonable and vexatious delay of payment (Ill. Rev. Stat. 1981, ch. 17, par. 6402) and that it should have been granted attorney fees and costs pursuant to the Interest Act (Ill. Rev. Stat. 1981, ch. 17, par. 6402) and to the Illinois Insurance Code (Ill. Rev. Stat. 1981, ch. 73, par. 767), because Commercial Union's conduct was "vexatious and unreasonable." Marvel urges that the trial court's denial of fees and costs was an abuse of discretion and points to Commercial Union's substantial and burdensome requests for documentation of the alleged losses, its demands for production of documents in court, and the delay of over seven years between the fire and the judgment.

In deciding whether the insurer has been guilty of unreasonable and vexatious delay, the trial court should take the totality of the cir-

cumstances into account, and its decision will not be disturbed absent an abuse of discretion. *Deverman v. Country Mutual Insurance Co.* (1977), 56 Ill. App. 3d 122, 124.

Although not all of Marvel's proof of business and property loss was challenged at trial and much testimony was not challenged, nonetheless there was a genuine dispute as to the amount due Marvel, and whether Marvel was entitled to collect at all. Marvel's claimed losses were revised at different points and exceeded the jury's award by a substantial margin. (See *Tyber v. Great Central Insurance Co.* (6th Cir. 1978), 572 F.2d 562; *Illinois Produce International, Inc. v. Reliance Insurance Co.* (N.D. Ill. 1975), 388 F. Supp. 29.) The case was complicated and much of the evidence and many of the conclusions of different witnesses were disputed. (See *Diamond Shamrock Corp. v. Lumbermens Mutual Casualty Co.* (7th Cir. 1972), 466 F.2d 722.) Also, the matter of the Humphrey documents, and the dispute over whether Marvel had properly represented the amount of inventory at its Skokie plant, even if not ultimately meritorious, do not appear so lacking in substance as not to justify a reasonable belief that the policy could ultimately be held void. (See *Crest v. State Farm Mutual Automobile Insurance Co.* (1974), 20 Ill. App. 3d 382; *Smith v. Metropolitan Life Insurance Co.* (N.D. Ill. 1982), 550 F. Supp. 896.) Given these facts we find no abuse of the trial court's exercise of discretion.

The judgment of the circuit court of Du Page County is affirmed. The cross-appeal is denied.

Affirmed.

NASH and VAN DEUSEN, JJ., concur.