THOMAS FLYNN, Plaintiff-Appellant, v. GOLDEN GRAIN COMPANY *et al.*, Defendants-Appellees.

First District (6th Division)   No. 1—93—3460

Opinion filed February 3, 1995.

James J. Stamos, of Stamos & Trucco, of Chicago, for appellant.

Wildman, Harrold, Allen & Dixon, of Chicago (James B. Vogts, of counsel), for appellees.

PRESIDING JUSTICE McNAMARA delivered the opinion of the court:

Plaintiff, Thomas Flynn, brought this Structural Work Act (Ill. Rev. Stat. 1987, ch. 48, par. 60 *et seq.*) action against defendants, Golden Grain Company and Facilities Engineering, for injuries he sustained when he fell from a plywood platform while removing asbestos panels from an oven located within Golden Grain's Bridgeview, Illinois, manufacturing facility. A jury found in favor of defendants and against plaintiff, and the trial court entered judgment on the verdict. Subsequently, plaintiff filed a motion for judgment notwithstanding the verdict or, in the alternative, for a new trial. The trial court denied the motion. Plaintiff appeals, contending that the trial court erred in (1) refusing to give the jury his tendered instruction based on Illinois Pattern Jury Instructions, Civil, No. 180.15 (3d ed. 1990) (hereinafter IPI Civil 3d), which encompasses violation of the Structural Work Act by omission; (2) giving the jury an instruction which paraphrased certain Occupational Safety and Health Administration (OSHA) regulations dealing with asbestos abatement; (3) refusing to admit into evidence an investigative report prepared by an employee of Facilities Engineering; and (4) admitting into evidence documents addressing the practices and procedures of plaintiff's employer pertaining to asbestos abatement.

The relevant facts are as follows. At the time plaintiff was injured, Golden Grain, a division of the Quaker Oats Company, was in the process of making extensive capital improvements at its Bridgeview facility. One such improvement consisted of removing and replacing a large dryer used to make pasta. Plaintiff was injured while removing asbestos from the dryer prior to its demolition.

To coordinate the various capital improvement projects occurring within the plant, Quaker Oats assigned to the plant a full-time project engineer named Royal Tischendorf. Tischendorf was responsible for overseeing the completion of various projects, including the removal of the dryer. Golden Grain contracted with Facilities Engineering for the services of Greg Mulac, who had daily supervising responsibilities at the site for the dryer removal project. He reported regularly to Golden Grain management regarding the progress of that particular project. Golden Grain also contracted with Intrastate Millwright Services, Inc., to perform the actual removal of the dryer. Intrastate Millwright worked under the supervision of Tischendorf and Mulac.

Tischendorf solicited bids from various asbestos abatement contractors and ultimately selected the bid submitted by Brand Asbestos Control Company, plaintiff's employer. Before Brand's bid was accepted, representatives conducted a walk-through of the pasta dryer. During the walk-through, Brand assessed the jobsite conditions, manpower needs, accessibility problems, and scaffolding needs. Tischendorf and Mulac accompanied the Brand representatives during the walk-through. Mulac testified that the Brand representatives told him and Tischendorf that no one from Golden Grain or Facilities Engineering was allowed in the work area. They were informed that Brand would assign a "lead person" to be in charge of the work and that Brand would "take care of it all."

In its May 5, 1987, proposal, Brand proposed to "furnish all necessary labor, supervision, tools, equipment and materials required for the removal of asbestos-containing insulation from the spaghetti dryer," and agreed that all work would be performed "in complete and legal accordance with OSHA Regulations ***, U.S. Environmental Protection Agency (EPA) Regulations for Asbestos ***, acceptable industry practices and project specifications and requirements, as applicable." The proposal also incorporated by reference the requirements of Brand's Respiratory Protection Program, with which Brand promised to comply. This proposal, along with a two-page standard form Quaker Oats contract, constituted the parties' asbestos abatement contract. Plaintiff introduced this contract into evidence at trial.

With respect to Golden Grain and Facilities Engineering's involvement in the asbestos removal work, the contract stated:

"For the purposes of safety and in order to minimize the potential for the contamination of individuals, access to the actual work area shall be completely restricted once work has commenced. No personnel will be allowed access to any designated work area without proper attire and respiratory protection. Respiratory protection and proper attire shall be made available at all times during the project for use by designated representatives of the owner, the consultant and/or engineer, or, if applicable, the independent air monitoring hygienist who may require entrance to the work area for the purpose of sampling, inspection or some other function. All individuals who enter the work area shall be subject to the requirements of The Brand Companies' Respiratory Protection Program and all other appropriate programs."

The terms of Brand's Respiratory Protection Program specified that respirators would not be issued to "individuals (including company officials, sub-contractors or visitors) who have not received appropriate respirator training and a medical clearance." The medical clearance would be given only after a comprehensive examination, a urinalysis, a chest X ray, and a pulmonary function test.

The standard form Quaker Oats contract set forth the following conditions and requirements regarding Golden Grain's involvement in the asbestos removal project:

"7. CHANGES IN THE WORK—OWNER may order changes in the work, the contract sum being increased or decreased accordingly. All such orders and adjustments shall be in writing and signed by OWNER'S Contracting Authority, and shall be executed under the conditions of the Contract Documents. Claims by Contractor for extra cost, including changes in completion date, must be made in writing before executing the work involved and no claim for an addition shall be valid unless so ordered.

8. CONDUCT OF WORK—All work done in performance of this contract shall be done in accordance with the requirements and instructions of the OWNER respecting hazards of all kinds. CONTRACTOR further agrees that the work shall be performed with a minimum of interference with OWNER'S operations.

9. GUARANTEE, INSPECTION AND CORRECTION OF THE WORK— CONTRACTOR shall permit and facilitate inspection of the work by OWNER and public authorities at all times. CONTRACTOR shall re-execute any work that fails to conform to the requirements of the contract and that appears during the progress of the work and shall remedy any defects due to faulty materials or workmanship and pay for any damages resulting therefrom

which appear within a period of one year from date of acceptance and final payment regardless of whether the work is done by subcontractors or direct employees of CONTRACTOR.

10. OWNER'S RIGHT TO TERMINATE—OWNER may terminate this contract for any reason at any time upon written notice to CONTRACTOR. In such event OWNER shall pay to CONTRACTOR actual cost of direct labor, material incorporated in the work and transportation to the site plus 15 percent thereof for overhead, plus 10 percent, plus $100.00, less any payments previously made."

The OSHA regulations in effect in May 1987 governing the demolition of asbestos-containing structures required Brand to establish a regulated work area which was segregated in such a manner as to minimize the number of persons within the area. The regulations also required Brand to restrict access to the area to authorized persons, who were defined as "any person authorized by the employer and required by work duties to be present in regulated areas." All persons entering the regulated area were to be supplied with a respirator, and no person was to be assigned to a task requiring use of a respirator unless it had first been determined that he was physically able to perform the work and use the equipment. The regulations also required the use of protective clothing in the regulated area.

In accordance with its contractual obligation and its own Asbestos Abatement Guidelines, Brand supplied all of the equipment and tools for the job. The guidelines as well as Brand's Respiratory Protection Program were part of the "Brand Safety Book" which the Brand job superintendent, Doug Weaver, and foreman kept at the jobsite.

When Brand arrived at the plant to begin the asbestos removal project, Golden Grain instructed Brand employees as to which doors to enter and exit through and what clothing to wear when moving about the facility. When Golden Grain instructed Brand to commence work, Brand enclosed in plastic the containment structure which Intrastate Millwright had constructed at Mulac's direction. Within the containment area was the partially dismantled dryer from which Brand was to remove the asbestos. A sign was placed on the entrance to the containment area, as required by Brand's Asbestos Abatement Guidelines, which read: "DANGER. ASBESTOS. CANCER AND LUNG DISEASE HAZARD. AUTHORIZED PERSONNEL ONLY. RESPIRATORS AND PROTECTIVE CLOTHING ARE REQUIRED IN THIS AREA."

Plaintiff testified that after Brand sealed and restricted the containment area and just prior to beginning the actual asbestos removal, Weaver, Brand's hygienist and a Golden Grain representative

walked through the area. Brand posted a daily job sign-in/sign-out and visitors log at the entrance. All persons entering and leaving the work area were required by Brand to sign in and sign out.

Weaver stated that he maintained the logs and enforced their use. He was also responsible for enforcing Brand's Respiratory Protection Program and applicable OSHA regulations at the site. Weaver enforced the requirement that all persons have a medical clearance before being issued a respirator.

After the containment area was sealed, Weaver decided how Brand workers were going to remove the asbestos panels from the top and sides of the pasta dryer. The dryer itself was approximately 200 feet long, 15 feet wide at the base and 15 feet high. Running approximately three feet below the asbestos panel roof was a divider or platform made of plywood planks which had been placed inside the dryer when it was originally constructed. When the dryer had been operational, Golden Grain employees regularly used the divider as a support when they entered the dryer to maintain it because there was no other way to service it.

As the job superintendent for Brand, Weaver decided against moving scaffolds into the area because it was "quicker and easier" to use the existing plywood divider. By walking and bouncing on it, Weaver determined that the divider was sturdy enough for his workers to use as a support.

Before asbestos removal commenced, Tischendorf entered the containment area and was photographed by Mulac. Mulac testified that he took photographs of the containment area because Golden Grain management required that all capital improvement projects be adequately documented. The photographs were not intended to monitor Brand's performance of the asbestos removal, according to Mulac, as evidenced by the fact that the film was not developed until after Brand had finished its work and departed the jobsite.

Tischendorf, Mulac, Weaver and a Brand asbestos worker all testified that neither Tischendorf nor Mulac entered the containment area after the asbestos removal work began on the dryer. Weaver testified that there was no reason why they would have entered the area once it had been restricted. Mulac testified that Facilities Engineering was not licensed to remove asbestos, and he did not know anything about the Federal regulations imposed on asbestos abatement. According to one of Brand's asbestos abatement workers, the custom in the industry is for the contractor to assume sole responsibility for directing the work and the conduct of the asbestos abatement workers. The customer generally has "no say" as to how the abatement work is performed.

The daily job sign-in/sign-out and visitor logs indicate that only Brand employees entered the area from the time it was restricted until plaintiff's fall. Tischendorf never encountered Weaver at the jobsite, and Mulac had contact with Weaver on only a few occasions. Weaver did not seek out Mulac to inform him of the status of the project because he had no need to do so. When they passed each other in the plant, Weaver told Mulac "everything was fine," that "they were moving along allright," and that "they [Brand workers] would take care of it all." Weaver did not expect that Mulac would come and tell him how to do the work.

According to Weaver, neither Mulac nor Tischendorf had any role in his decision as to how his workers were going to get up and remove the asbestos panels. Weaver did not ask them to approve or disapprove his plan to use the plywood divider as a work support. He chose to use the platform because he thought it was safe and was the easiest way for the workers to remove the asbestos panels.

Plaintiff and his co-workers received their directions solely from Brand superiors. The evidence indicates that no one from Golden Grain or Facilities Engineering stopped, changed, or inspected the work in progress inside the containment area. Mulac and Tischendorf merely approved verification tickets which authorized payment of additional monies to Brand for performing additional work not covered by the terms of the original contract. Nowhere in the asbestos abatement contract did it state that Golden Grain had an obligation to inspect, monitor or supervise the work performed by Brand inside the containment area. Although Mulac reported to Golden Grain management the percentage of work which Brand had completed on the project, he did not report details of the job. Tischendorf and Mulac inspected Brand's work after the asbestos removal project had been completed to ensure that "everything was gone and everything was ready for the new oven to be installed."

Plaintiff's accident occurred on May 29, 1987. Plaintiff testified that he was crawling backwards on the wooden divider removing asbestos panels when the divider cracked. Plaintiff fell 12 feet to the ground, landing on both knees. Following the fall, Mulac received a form from Rick Rozko, a Golden Grain employee, entitled "Supervisor's Accident Investigation Loss Source Identification." Rozko asked Mulac to complete the form. Mulac told Rozko he did not know for sure what had happened. Mulac did not investigate the accident, but merely recorded information he had received from two asbestos workers employed by Brand. Mulac wrote that plaintiff was "removing asbestos from inside of dryer [when] the plank he was standing on gave way." Mulac also wrote that the "wood was dried out, and just

gave way." He also wrote that "new planks will be brought in and installed." Mulac returned the form to Rozko unsigned.

Following the accident, Weaver decided to bring new planks into the containment area. Brand supplied the new planks and positioned them. Mulac testified that he took no remedial measures after plaintiff's fall to prevent another accident.

At trial, plaintiff attempted to introduce the form filled out by Mulac as a business record and as a party admission through the testimony of Mulac. The trial court ruled that a foundation for admitting the form had not been made and accordingly excluded the evidence. In an effort to provide a foundation, plaintiff requested for the first time that Golden Grain produce an unidentified "keeper of business records" pursuant to Supreme Court Rule 237. (134 Ill. 2d R. 237.) The trial court denied the request.

■ The Structural Work Act provides that any "owner, contractor, sub-contractor, foreman or other person having charge of the erection, construction, repairing, alteration, removal or painting of any building, bridge, viaduct or other structure within the provisions of th[e] act, shall comply with all the terms thereof." (Ill. Rev. Stat. 1987, ch. 48, par. 69.) Section 1 of the Act requires that "[a]ll scaffolds [or other supports] erected or constructed by any person, firm or corporation in this State for the use in the *** removal *** of any *** structure, shall be erected and constructed, in a safe, suitable and proper manner, and shall be so erected and constructed, placed and operated as to give proper and adequate protection to the life and limb of any person or persons employed or engaged thereon." (Ill. Rev. Stat. 1987, ch. 48, par. 60.) The jury in this case found that neither of the defendants violated this requirement. Plaintiff does not challenge the sufficiency of the evidence to support such a finding, but argues that the trial court made several erroneous rulings which violated his right to a fair trial.

Plaintiff first contends that he was denied a fair trial because the jury was not adequately instructed as to the "violation" element of his case and because the jury was given an instruction which paraphrased various OSHA regulations pertaining to asbestos abatement despite the fact that he was not alleging that defendants had violated these regulations.

As to the first of these two contentions, plaintiff argues that the facts presented in this case supported the giving of an instruction based on IPI Civil 3d No. 180.15. The tendered instruction reads as follows:

"In these instructions I have used the term 'violation of the Structural Work Act.' The statute was violated if the person[s]

having charge of the work failed to provide a scaffold, support or mechanical contrivance or device under circumstances which required a scaffold, support or mechanical contrivance or device in order to protect the plaintiff, Tom Flynn, from injury and the defendants knew or, in the exercise of ordinary care, could have known that a scaffold, support or other mechanical device was required.

That statute does not state when a scaffold, support or other mechanical device is required. Whether a scaffold, support or other mechanical device was required under the circumstances of this case is for you to decide."

The court refused this instruction because it found that plaintiff's theory of the case hinged, not on defendants' failure to provide a scaffold or other support device, but on their provision of an unsafe or otherwise inadequate support. On this basis, the trial court agreed that the following instruction offered by plaintiff, based on IPI Civil 3d No. 180.14, was sufficient:

"In these instructions, I have used the term, 'violation of the Structural Work Act.' The statute is violated if the support or other mechanical contrivances or device in question—the plywood platform allegedly—was placed, used in a manner, or was in a condition under circumstances that were not safe so as to give adequate protection to the life and limb of any person employed or engaged thereon and the defendants knew of the placement, use, or condition of the support, mechanical contrivance or device or in the exercise of ordinary care, they could have discovered it.

When I use the words, 'ordinary care,' I mean the care a reasonable careful person would use under circumstances similar to those shown by the evidence. The law does not say how a reasonable careful person would act under those circumstances. That is for you to decide."

As a general rule, each party has the right to have the jury instructed on its theory of the case, and the trial court, in the exercise of its discretion, must instruct the jury on all issues which it finds have been raised and supported by evidence presented. (*Wade v. City of Chicago Heights* (1991), 216 Ill. App. 3d 418, 575 N.E.2d 1288.) However, the refusal to give a requested instruction will result in a new trial only where the complaining party shows serious prejudice to the right to a fair trial. *Wille v. Navistar International Transportation Corp.* (1991), 222 Ill. App. 3d 833, 584 N.E.2d 425.

In support of his contention that the court erred in refusing his tendered instruction, plaintiff cites *Crothers v. La Salle Institute* (1977), 68 Ill. 2d 399, 370 N.E.2d 213. He argues that the court in *Crothers* held it is reversible error, requiring a new trial, to refuse to

give both IPI Civil 2d Nos. 180.14 and 180.15 in any case involving alleged violations of the Structural Work Act. Our reading of *Crothers*, however, does not comport with that analysis.

In *Crothers*, the plaintiff was installing insulation atop a steel roof. Plaintiff was working backward toward the roof's edge when a gust of wind threw him off balance, causing him to fall to the ground. The plaintiff's expert testified that it was the custom in the industry to provide various types of perimeter safety devices to protect men working on a flat roof. None of the various methods of protection were present when the plaintiff fell.

At the request of the plaintiff, the trial court in *Crothers* gave the jury IPI Civil 2d No. 180.15 in accordance with the plaintiff's theory that the omission of perimeter roof protection proximately caused his fall. The trial court, however, refused to give a version of IPI Civil 2d No. 180.14 based on the defendant's objection that, as worded, the instruction assumed or held the roof was a scaffold within the meaning of the Structural Work Act as a matter of law, whereas such determination of what a roof is or is being used for is a question of fact for the jury. The instruction which was refused stated that the Act was violated "if the roof in question was not safe so as to give adequate protection to the life and limb of any person employed thereon and the defendant knew of the condition or, in the exercise of ordinary care it could have discovered it." *Crothers*, 68 Ill. 2d at 405, 370 N.E.2d at 216.

In reaching its decision that the instruction should have been given, the supreme court in *Crothers* reviewed at length prior decisions of Illinois courts in which the courts had determined, as a matter of law, that a roof was a support within the meaning of the Structural Work Act. Based on these decisions, the *Crothers* court held that the jury should have been instructed that the roof from which the plaintiff fell was a "scaffold" within the meaning of the Act, and that the refused instruction based on IPI Civil 2d No. 180.14 was necessary to accomplish that purpose. *Crothers*, 68 Ill. 2d at 412-13, 370 N.E.2d at 220.

As the foregoing discussion indicates, *Crothers* stands for the proposition that in those Structural Work Act cases involving devices which are not typically perceived as supports or scaffolds but which are determined by the court to be such for purposes of the Act, an instruction informing the jury of that determination is required.

■ In the present case, the trial court found as a matter of law that the plywood divider was a support within the meaning of the Structural Work Act, and the jury was so instructed. As far as the *Crothers* holding is concerned, therefore, no deficiency existed in the jury instructions given.

Plaintiff argues, however, that the instruction should have been given because his complaint alleged a violation of the Act by omission (*i.e., failure* to provide a scaffold or other support device), which is the precise situation for which IPI Civil 3d No. 180.15 was intended. Without the instruction, plaintiff maintains he was deprived of his right to have the jury instructed on his theory of the case. We do not agree that the circumstances presented here required the giving of the instruction.

Plaintiff alleged in his complaint that "the Defendants *** erected, constructed or placed or caused to be erected, constructed or placed a certain scaffold or support to facilitate or be used in the construction of and/or asbestos removal from these premises" and that "[a]s a direct and proximate result of the Defendants' wilful and wrongful acts and/or omissions, Plaintiff fell through this scaffold or support." He also alleged that defendants wilfully violated the Act by "fail[ing] to erect a safe, suitable and proper scaffold or support" for his protection. This latter allegation, plaintiff argues, warranted the giving of the instruction because it represented an allegation of violation of the Structural Work Act by omission.

The "Notes on Use" following IPI Civil 3d No. 180.15 state that "[t]his instruction should be used only in a case where the violation of the Structural Work Act alleged is *** failure to provide a scaffold or other device." Our interpretation of plaintiff's allegation is not that defendants failed to provide a scaffold or other device, but that they provided one—in the form of a plywood divider—that was unsafe, unsuitable and improper, in violation of the Act. Under these circumstances, we agree with the trial court that the giving of plaintiff's instruction based on IPI Civil 3d No. 180.14 was sufficient.

Plaintiff also argues that the trial court erred in instructing the jury as to the various OSHA regulations pertaining to the removal of asbestos which were in effect at the time of his accident. The instruction informed the jury:

"The regulations required the asbestos abatement contractor to establish a regulated work area which was demarcated in a manner that minimized the number of persons within the area. The regulations required that access to the regulated areas was to be limited to authorized persons. The regulations required the asbestos abatement contractor, wherever feasible, to build a negative pressure enclosure around the regulated area and control entry to and exit from it. All persons entering the enclosed regulated area were to be provided and trained in the use of respirators.

The regulations define an authorized person as any person au-

thorized by the asbestos abatement contractor and required by work duties to be present in regulated areas.

The regulations state that users of respirators are to be properly instructed in their selection, use, and maintenance. Both supervisors and workers shall be so instructed by competent persons. Training shall provide the men an opportunity to handle the respirator, have it fitted properly, test its face-piece-to-face seal, wear it in normal air for a long familiarity period, and, finally to wear it in a test atmosphere.

The regulations also state that persons should not be assigned to tasks requiring the use of respirators unless it has been determined that they are physically able to perform the work and use the equipment. The local physician shall determine what health and physical conditions are pertinent."

The instruction into which the regulations were incorporated was based on IPI Civil 3d No. 60.01 (1989). Plaintiff contends that the giving of the instruction was improper because IPI Civil 3d No. 60.01 is only to be given in cases where the plaintiff alleges that his injuries were proximately caused by a violation of the particular regulation, ordinance or statute discussed in the instruction, and in this case he did not allege that his injuries were proximately caused by a violation of the OSHA regulations.

●4 We agree with plaintiff that, as a general rule, IPI Civil 3d No. 60.01 is limited to the sort of situation which he describes. The Notes on Use following the instruction state it should be given "only where the evidence would support a finding that the injury complained of was proximately caused by a violation of a statute, ordinance, or administrative regulation, rule, or order intended to protect against such an injury, and that the injured party is within the class intended to be protected by the statute, ordinance, or administrative regulation." (IPI Civil 3d No. 60.01, Notes on Use, at 60-7.) Plaintiff is correct that the evidence here would not support a finding that his injury was proximately caused by a violation of the OSHA regulations. Nevertheless, for the reasons which follow, we do not believe that the giving of the instruction constitutes reversible error.

In *Tenenbaum v. City of Chicago* (1975), 60 Ill. 2d 363, 325 N.E.2d 607, a case involving the Structural Work Act, the plaintiff's attorney was permitted by the trial court to read to the jury portions of a relevant city ordinance relating to safety in the construction of buildings. The supreme court held "[j]ust as evidence of regulations, standards and building codes may be admitted to aid the finder of fact in deciding the standard of care in a negligence action [citation], it may be admitted in an action based on the Structural Work Act as an aid to the jury in determining whether a violation of the Act was

willful." (*Tenenbaum*, 60 Ill. 2d at 375-76, 325 N.E.2d at 615.) The court agreed with this court, however, that it was improper for the ordinance excerpts to be read to the jury by the plaintiff's attorney. The court held that the trial court should have read the ordinance to the jury because it is "the duty of the court [not counsel] to instruct the jury as to the law." *Tenenbaum*, 60 Ill. 2d at 375, 325 N.E.2d at 615.

In the present case, the OSHA regulations were incorporated by reference into the parties' contract, which was admitted into evidence by plaintiff, and were referred to generally by various witnesses at trial. Brand stated in its written proposal, which later became part of the contract, that the "proposal has been prepared on the basis of all federal and state regulations and guidelines in effect on the date of this proposal" and that "[a]ll work shall be performed *** in complete and legal accordance with current OSHA Regulations including Appendix 'A.' " The instruction at issue merely set forth the requirements of the applicable OSHA regulations in an impartial, nonargumentative manner. We believe this was proper because, as in *Tenenbaum*, the regulations were material to the issue of whether one or both of the defendants willfully violated the Structural Work Act.

As part of his case in chief, plaintiff was required to prove that one or both of the defendants knew that the plywood divider was being used as a support and that it was unsafe or, in the exercise of ordinary care, could have known of these things. Federal OSHA regulations which restricted access to the area to certain authorized persons, which defendants may or may not have been considered to be, were directly relevant to the jury's determination of how a reasonable person in the exercise of ordinary care would have acted under similar circumstances. Just as the jury was free to determine that the regulations would, to a reasonable person, pose an obstacle to entry and inspection of the containment area, it was equally free to find that a reasonable person exercising ordinary care would have taken the necessary steps, as spelled out in the regulations, to gain access to the area for the purpose of inspecting for unsafe work practices. In our view, the jury was entitled to know the applicable law on the subject, and, according to *Tenenbaum*, it was the exclusive province of the trial judge to make that applicable law known to the jury.

We disagree with plaintiff that the instruction could have misled the jury into concluding that defendants were not liable because they complied with the relevant OSHA regulations. The record reveals that the jury was fully and accurately instructed as to the circum-

stances under which a violation of the Structural Work Act by one or both defendants may be found to exist. We note, finally, that even if it was error to give the instruction, plaintiff has failed to show that, but for the erroneous instruction, the verdict might have been different. We believe, and plaintiff has not disputed, that there was sufficient evidence to support the jury's verdict in favor of both defendants. Where a party does not argue that the verdict was against the manifest weight of the evidence, something more than a mere possibility of prejudice is required for a new trial to be warranted for the giving of an erroneous jury instruction. (*Sale v. Allstate Insurance Co.* (1984), 126 Ill. App. 3d 905, 467 N.E.2d 1023.) Under the circumstances here, we cannot conclude that the jury's verdict would have changed had the instruction not been given.

●5 Plaintiff next contends that the trial court erred in excluding from evidence the post-accident report which Rozko of Golden Grain asked Mulac to fill out. After speaking with two asbestos removal workers employed by Brand, Mulac wrote that plaintiff was "removing asbestos from inside of dryer [when] the plank he was standing on gave way." He also wrote that the "wood was dried out, and just gave way," and that "new planks will be brought in and installed." Plaintiff sought to admit the report to show that defendants had admitted that the plywood platform collapsed, that it was defective, and that they knew or should have known the plywood was defective and, by virtue of Mulac's "recommendation" to replace the broken plywood, that they exercised control over the jobsite. The trial court excluded the report on the grounds that it contained inadmissible hearsay and did not qualify as a business record.

We need not reach the question of whether the trial court's grounds for excluding the report were correct because we find that, even if the report was admitted, the outcome of the trial would not have changed.

We note initially that neither defendant disputed that the plywood divider collapsed. The report thus added nothing in the way of an admission on this particular point. Moreover, we note from the record that Mulac did not acquire any of the information contained in the report until *after* plaintiff's accident had already occurred. It is therefore difficult to understand how the report shed light on what either of the defendants knew or, in the exercise of ordinary care, could have known about the condition of the plywood *before* plaintiff's fall. Moreover, we disagree with plaintiff that the statement contained in the report, that "new planks will be brought in and installed," could be considered a "recommendation" on the part of Mulac to replace the broken plywood and hence evidence of control

over the jobsite. Mulac testified that he merely "wrote down what [he] was told out there on the floor" by two of plaintiff's co-workers. He stated that he did not take any remedial steps to prevent another accident from occurring subsequent to speaking with the two asbestos workers. Additionally, plaintiff's own witness, Hederman, testified that the decision was made by Weaver, Brand's foreman, to bring in new planks to be used as supports after the one on which plaintiff was standing collapsed. For these reasons, we conclude that the admission of the report would not have dictated a different outcome, and any error in its exclusion was therefore harmless.

●6 Finally, plaintiff argues that the trial court erred in admitting into evidence Brand's Respiratory Protection Plan and Asbestos Abatement Guidelines. Defendants' theory of the case, in part, was that they were not "in charge of" the work site because they never entered the containment area and that Brand's Respiratory Protection Plan and Asbestos Abatement Guidelines made it difficult to do so. The trial court allowed these documents into evidence after finding that defendants had presented a sufficient foundation. Plaintiff argues that a proper foundation was lacking because defendants were unable to authenticate that either document was in effect at the time of plaintiff's accident.

The requirement of authentication is satisfied where the evidence is sufficient to support a finding by a reasonable juror that it is more probably true than not true that the matter in question is what its proponent claims. (See M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 901.1, at 713 (5th ed. 1990).) This preliminary determination is made by the court. (*Marvel Engineering Co. v. Commercial Union Insurance Co.* (1983), 118 Ill. App. 3d 844, 455 N.E.2d 545.) In this case, the trial court determined that the evidence offered by defendants was sufficient to support a finding by a reasonable juror that the two documents were in fact the documents in effect at the time of the accident. We agree with this determination.

As to the Asbestos Abatement Guidelines, Linas Dapkus, a former asbestos worker and later a supervisor for Brand, testified that he was familiar with the guidelines, and he identified defendants' proferred exhibit as the guidelines which were in effect at the time of plaintiff's fall. Without objection by plaintiff, Dapkus proceeded to read portions of the guidelines into evidence. We believe Dapkus' testimony alone provided a sufficient foundation for the admission of the Asbestos Abatement Guidelines into evidence.

In addition to Dapkus, Weaver also offered testimony which assisted in providing a foundation, not only for admission of the Asbestos Abatement Guidelines, but also for Brand's Respiratory

Protection Plan. Weaver began the Golden Grain job as general foreman and during the job was promoted to superintendent. He testified that when he was promoted in May 1987—the same month of plaintiff's accident—he was given the "Brand Safety Book," which included the two documents at issue. Weaver testified that the safety book was kept in the regular and ordinary course of business, and he further testified that neither of the documents which defendants sought to admit had, to his knowledge, been updated prior to May 1987.

We believe that the foundation evidence offered by defendants was sufficient to support a finding that the documents were authenticated and were in effect at the time of plaintiff's injury. Accordingly, we find no error in their admission.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

EGAN and ZWICK, JJ., concur.